**EQUAL EMPLOYMENT OPPORTUNITY COMMISSION et al.**

v.

**AMERICAN TELEPHONE AND TELEGRAPH COMPANY et al.**

Civ. A. No. 73–149.

United States District Court,
E. D. Pennsylvania.

Aug. 23, 1976.

As Amended Sept. 15, 1976.

Robert E. J. Curran, U. S. Atty., Philadelphia, Pa., C. Daniel Karnes, Ethel Ollivierre, Equal Employment Opportunity Commission, Carin Ann Clauss, Karl W. Heckman, Dept. of Labor, James S. Angus, Terence G. Connor, Dept. of Justice, Washington, D. C., for plaintiffs.

Thompson Powers, Jane Lang McGrew, Washington, D. C., Kimber E. Vought, Bernard G. Segal, Philadelphia, Pa., for defendants.

Charles V. Koons, Matthew A. Kane, Washington, D. C., Richard H. Markowitz, Philadelphia, Pa., for Communications Workers of America, intervenor-defendant.

Elihu I. Leifer, Washington, D. C., Louis H. Wilderman, Philadelphia, Pa., for Telephone Coordinating Council TCC–1 and National Bell Council, International Brotherhood of Electrical Workers, intervenor-defendant.

Abraham Weiner, New York City, Ira I. Pechter, Philadelphia, Pa., for Alliance of Independent Telephone Unions, intervenor-defendant.

## OPINION

HIGGINBOTHAM, District Judge.

### I.

### INTRODUCTION

The instant matter involves a series of motions and petitions filed by the parties to this civil rights action, wherein those parties seek to modify or supplement a Consent Decree approved by this Court on January 18, 1973. The intervening defendants (hereinafter "Intervenors")—the Communications Workers of America (hereinafter "CWA"), the Telephone Coordinating Council TCC–1 (National Bell Council) of the International Brotherhood of Electrical Workers (hereinafter "IBEW"), and the Alliance of Independent Telephone Unions (hereinafter "Alliance")—have each petitioned this Court to modify the Consent Decree. In their respective petitions, one or more of the intervenors allege that the defendants' use, in purported compliance with the Consent Decree, of an affirmative action override to fill job vacancies in order to meet targets and goals for the employment of women and minorities violates the Consent Decree itself, the intervenors' collective bargaining agreements with the defendants, the requirements of applicable federal law and the Constitution of the United States. The intervenors also object to the use by defendants, pursuant to the decree, of an upgrading and transfer plan for the filling of job vacancies with defendant operating companies. Relying on some or all of these grounds, CWA has moved the Court to preliminarily enjoin the defendants from further use of the affirmative action override and IBEW has moved for summary judgment on the issues raised in its petition to modify.

The plaintiffs—the Equal Employment Opportunity Commission, the Secretary of Labor and the United States (hereinafter "Government plaintiffs")—and the defendants—the American Telephone and Telegraph Company and the operating companies of the Bell System (hereinafter "AT&T")—have jointly moved the Court to enter a Supplemental Order designed to correct deficiencies in the operating companies' 1973 and 1974 performance of their obligations under the Consent Decree. The Intervenors vigorously oppose the entry of this Supplemental Order, while the Government plaintiffs and AT&T have voiced equally strong objections to the Intervenors' proposed modifications of the Consent Decree.

After hearing extensive oral argument on the matter and after reviewing the voluminous pleadings and memoranda of law filed by the parties, documents that, after a while, enriched the photocopying industry far more than they enlightened the Court, I have concluded that the Government plaintiffs and AT&T should prevail. Accordingly, for reasons that will hereinafter appear, the Intervenors' petitions to modify the Consent Decree will be denied, IBEW's motion for summary judgment will be denied, and the joint motion of the government plaintiffs and AT&T for entry of the proposed Supplemental Order will be granted. Since my decision on the merits of the Intervenors' petitions to modify the Consent Decree effectively disposes of the issues raised in CWA's motion for a preliminary injunction, that motion will be dismissed as moot.

## II.

### HISTORY OF THE CASE

The prior history of this civil rights action is set forth at some length in *Equal Employment Opportunity Commission v. American Telephone and Telegraph Company,* 365 F.Supp. 1105 (E.D.Pa.1973), and in *Equal Employment Opportunity Commission v. American Telephone and Telegraph Company,* 506 F.2d 735 (3d Cir. 1974), *affirming in part and remanding in part* 365 F.Supp. 1105 (E.D.Pa.1973). It would unnecessarily extend a rather lengthy opinion to recite that history in detail here. For present purposes, it suffices to say that in the course of proceedings before the Federal Communications Commission, wherein the instant defendants were charged with employment discrimination under Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e *et seq.,* under the Fair Labor Standards Act of 1938, as amended, the Equal Pay Act of 1963, 29 U.S.C. §§ 201 *et seq.,* and under Executive Order No. 11246, the Government plaintiffs and AT&T embarked on settlement negotiations that resulted in a Memorandum of Agreement between the parties [1] and a Consent Decree which was approved by this Court on January 18, 1973. Shortly after the entry of the Consent Decree, CWA sought to intervene as a party plaintiff. On October 5, 1973, I denied CWA's motion generally, but did grant it restricted leave to intervene, pursuant to 42 U.S.C. § 2000e–5(f)(1), to litigate the rights of pregnant female employees of defendants. See 365 F.Supp. 1105 (E.D.Pa.1973). On appeal, the Court of Appeals affirmed my general dismissal of CWA as a party plaintiff, dismissed AT&T's appeal from the limited grant of intervention on the issue of maternity benefits for lack of jurisdiction, and granted CWA the right to intervene as a party defendant in order to seek modification of the Consent Decree insofar as the decree modifies or invalidates provisions of CWA's collective bargaining agreements with AT&T, and impairs or impedes CWA's ability to enforce or protect those provisions. 506 F.2d 735 (3d Cir. 1974). AT&T then renewed its motion to dismiss CWA as a party plaintiff, and I granted that motion in an unreported memorandum opinion and order filed July 3, 1975. In the meantime, CWA had sought and been granted leave to intervene as a party defendant. Doc. # 68, filed March 26, 1975. Subsequently, IBEW and the Alliance sought and were granted leave to intervene as parties defendant on the same basis that the Court of Appeals had permitted CWA to intervene, namely, to protect or enforce their collective bargaining agreements with the defendants. Doc. # 96, filed July 18, 1975. While these last two labor organizations were seeking to intervene, the Government plaintiffs and AT&T jointly filed with the Court an Interim Report listing the employment goals for minorities, women and white males set pursuant to the original Consent Decree and describing the problems encountered by AT&T's operating companies in their efforts to achieve those goals. At the same time, AT&T and the Government plaintiffs jointly moved the Court to enter a Supplemental Order, agreed to by both parties, which was designed to correct deficiencies in the 1973 and 1974 performance by the operating companies of their obligations under the original Decree. Doc. # 73, filed May 13, 1975. Simultaneously with their petitions to intervene, the Intervenors had also requested the Court to modify the Consent Decree. See Doc. # 65 (CWA), Doc. # 71 (IBEW), Doc. # 74 (Alliance). CWA additionally moved for a preliminary injunction to restrain the operation of the Consent Decree pending the disposition, on the merits, of its petition to modify the decree. See Doc. # 65. The case took a final procedural turn on June 30, 1975, when IBEW moved for summary judgment on the issues raised in its own petition to modify. See Doc. # 89. All of the issues raised in the various petitions and motions were extensively briefed by the parties, then were argued to the Court at great length on July 18, 1975. At oral argument, the Court sought the assistance of counsel on the question of the use by federal courts

---

1. See 1 CCH Emp.Prac. ¶ 1860, at 1533–3 to 1533–14.

of "quota" remedies in recent employment discrimination cases. IBEW, the Government plaintiffs and AT&T responded with memoranda of law. See Docs. # # 99, 101, 102. While it is probably true that every federal trial judge is always in need of further enlightenment from counsel, it is difficult to imagine a case where the issues have been more thoroughly explored than here. The positions of the various parties are clear; the issues presented by these petitions and motions are surely ripe for decision.

One further comment on the nature of this litigation is appropriate. The instant case is unique. On the broader civil rights issued involved (exclusive of leaves to pregnant women, see 365 F.Supp. at 1126), there was no significant pending litigation in the federal courts when this consent decree was signed or during the critical years when the extensive negotiations that led to the decree took place. I have mentioned previously that CWA particularly had remained intentionally aloof while this critical $38 million settlement was being negotiated. 365 F.Supp. at 1109. Thus, I am not suggesting that a consent decree should never be modified so long as governmental plaintiffs and defendants have agreed to it. For there may be a time when a decree is on its face so grossly inadequate or basically unfair that modification is required. Accordingly, I am limiting my holdings to the facts of this case where, on the present record, I am confident that the modifications sought by the unions are neither required nor in accord with the law or the rationale of Title VII.

### III.

### THE CLAIMS OF THE PARTIES

In the interest of clarity, it seems advisable to review *seriatim* and in some detail the claims of the various parties and their respective requests for relief. Without such a review, I suspect that the remainder of this opinion would be largely unintelligible.[2]

#### 1. The CWA Claims

CWA is the collective bargaining representative for approximately 600,000 non-management employees of AT&T and its subsidiary operating companies, and is a party to collective bargaining agreements with all but three of the defendant companies.[3] CWA alleges that these collective bargaining agreements deal with numerous conditions of employment that have been and are directly affected by the Memorandum of Agreement entered into by the plaintiffs and the defendants on January 18, 1973,[4] and by the Consent Decree entered by this Court in this action on the same date. It further alleges that the defendants, acting under color of that Decree, have violated CWA's rights under those collective bargaining agreements and the past practices of the parties to those agreements, and have violated Part B, Section II, Paragraph D of the Consent Decree itself. Specifically, CWA charges that the defendants have (1) instituted transfer and promotion policies that disregard the seniority of employees CWA represents, and thus have violated the defendants' contractual obligations to these employees, as well as Part A, Section III of the Consent Decree and § 703(h) of the Civil Rights Act of 1964; (2) preferentially promoted and transferred employees solely on the basis of race or sex, thus violating both the defendants' contractual obligations and, since this preferential treatment was not required by the Consent Decree, Title VII of the Civil Rights Act of 1964 as well; (3) denied promotion and transfer opportunities to employees with

<hr/>

2. The exposition of the intervenors' claims is based on their petitions to modify the Consent Decree. Obviously, to the extent that the Proposed Supplemental Order incorporates and continues the remedies established by the decree, the intervenors find it objectionable for similar reasons.

3. The exceptions are the Southern New England Telephone Company, the Bell Telephone Company of Pennsylvania, and the Diamond State Telephone Company.

4. See 1 CCH Emp.Prac. ¶ 1860, at 1533–3 to 1533–14.

seniority while hiring persons never previously employed by the defendants, thus violating the defendants' collective bargaining agreements with CWA, the spirit and intent of the Consent Decree, and the requirements of law; (4) limited the number of applications an individual employee may file for transfer or promotion, thus violating the past practices of the parties, their contractual obligations, and the spirit and intent of the Consent Decree; (5) limited the departments or geographical areas from which employees may transfer to other departments or geographical areas; (6) imposed time-in-title requirements[5] upon the eligibility of employees for promotion, said requirements being more restrictive than the parties' past practices or their contractual obligations, and thus violating Part A, Section III, Paragraph D of the Consent Decree; and (7) imposed testing requirements upon the rights of employees to seek promotion. In its prayer for relief, CWA seeks a temporary injunction restraining the defendants from deviating, in their transfer and promotion policies, from their collective bargaining agreements or the past practices of the parties to those agreements, and further requests that the Consent Decree of January 18, 1973 be specifically modified to (1) require the defendants aggressively to recruit females and minorities for entry-level jobs in which females and minorities are currently underutilized; (2) restrain the defendants from limiting the number of transfer requests an individual employee may file; (3) restrain the defendants from establishing departmental or geographical limits on transfer or promotion opportunities that are less than coextensive with the relevant bargaining unit; (4) provide for the selection of applicants for a vacancy, whether transfer or promotion, on the basis of Bell System net credited service, so long as the applicants are basically qualified for the position they seek, and provide further that maternity leave be treated as any other temporary disability in the computation of net credited service; (5) restrain the defendants from imposing time-in-title requirements on applicants for transfer or promotion; (6) restrain the defendants from disqualifying from transfer or promotion otherwise qualified applicants for a vacancy because the applicants failed a qualification test within the Bell System; (7) require the defendants to develop and implement, in conjunction with the intervenors, Bell System-wide transfer procedures; and (8) provide that in arbitration proceedings where an arbitrator decides that an alleged conflict between a collective bargaining agreement and the defendants' obligations under a statute, administrative order or court decree is non-existent, the provisions of the collective bargaining agreement shall control.

### 2. The IBEW Claims

The Telephone Coordinating Council TCC–1 (National Bell Council), IBEW (herein called "IBEW") is an unincorporated association composed exclusively of those IBEW local unions which are the collective bargaining representatives of approximately 70,000 non-management employees of certain defendant operating companies of AT&T.[6] In support of its petition to modify the Consent Decree, IBEW alleges that these local unions are parties to collective bargaining agreements with the aforementioned operating companies; that several of these agreements establish seniority as a factor to be considered in the filling of job vacancies by transfer and promotion; that these seniority provisions were neither designed nor intended to disguise discriminatory practices; that portions of the Consent Decree require that, in certain circumstances, job vacancies be filled without regard to seniority; that job vacancies have been

---

**5.** These require that an employee work in a particular job title for a specified period of time before he or she is eligible to transfer.

**6.** Those companies are Illinois Bell Telephone Company, Mountain States Telephone & Telegraph Company, New England Telephone & Telegraph Company, New Jersey Bell Telephone Company, Pacific Northwest Bell Telephone Company, the Bell Telephone Company of Pennsylvania, the Pacific Telephone & Telegraph Company and Bell Telephone Company of Nevada.

filled by the application of this "seniority override" and will continue to be filled by it so long as the Consent Decree remains in effect; that the application of the seniority override may result, and has resulted, in the selection of candidates for job vacancies who have never been discriminated against by the defendants; that such selections will continue so long as the Consent Decree remains in effect; that the use of this seniority override directly conflicts with the collective bargaining agreements mentioned above and with the past practice of the parties under those agreements and changes the terms and conditions of employment of the members of the local unions without the latter's agreement; that the portions of the Consent Decree requiring the use of the seniority override violate the Fifth and Fourteenth Amendments to the Constitution of the United States, Title VII of the Civil Rights Act of 1964, Executive Order No. 11246, the regulations under that order, and the National Labor Relations Act; that the increased utilization of minorities and women in jobs with the operating companies where they are presently underutilized could be achieved by other affirmative action programs that do not require a seniority override; that certain designations and determinations contained in the Consent Decree directly affect the extent to which the seniority override has been, and will be used;[7] that these designations and determinations are deficient in rational justification and factual foundation, and resulted from an inadequate procedure; that the application of the seniority override, insofar as it is based upon them, therefore violates the Fifth and Fourteenth Amendments, Title VII, and Executive Order No. 11246 and its accompanying regulations; that the government plaintiffs and AT&T, by applying the seniority override within a one-year time frame, have violated Title VII, and Executive Order No. 11246 and its accompanying regulations; that the Consent Decree established in the defendant operating companies an upgrading and transfer plan for, among other purposes, the filling of vacancies; that this plan was not agreed to by the local IBEW unions, was not required by Title VII or by Executive Order 11246 or its accompanying regulations, and is not the only procedural device for the filling of vacancies which satisfies the requirements of applicable federal law; that the choice of such a procedural device for the filling of vacancies is a proper subject for collective bargaining; and that the Consent Decree, because it incorporated without union approval the aforementioned upgrading and transfer plan, unnecessarily conflicts with employee rights secured under the National Labor Relations Act.

In the prayer for relief of its initial petition, IBEW specifically asks this Court to (1) set aside those portions of the Consent Decree which require or allow the filling of job vacancies in IBEW's Bell System bargaining units on the basis of race, sex or national origin, whether in disregard of seniority standards or not; (2) prohibit any future filling of job vacancies in its Bell System bargaining units on the basis of race, sex or national origin, whether in disregard of seniority standards or not; (3) set aside those portions of the Consent Decree which require or allow the defendants to use an upgrading and transfer plan for the filling of job vacancies in IBEW's Bell System bargaining units where the defendants had not previously used such a plan; and (4) insofar as the upgrading and transfer plan is set aside by this Court, direct the appropriate representatives of defendants to negotiate with IBEW representatives the adoption of an alternate device for the fill-

---

**7.** The Decree designates and/or determines "AAP job classifications" (positions in which minorities and women have been underutilized), "establishments" (the geographical areas in which such underutilization has occurred), "underutilization" (the extent to which employment opportunities for minorities and women have been limited or reduced by the defendants' alleged discrimination), and "goals" and "intermediate targets within stated time frames" (the number of placements of minorities and women that defendants must make in order to demonstrate that they have corrected, or are promptly correcting, the previous underutilization).

ing of vacancies that would comply with the requirements of Title VII and Executive Order No. 11246.[8]

3. **The Claims of the Alliance of Independent Telephone Unions**

In its petition to modify and to supplement the Consent Decree, the Alliance alleges that it is a federation of labor organizations which are the collective bargaining representatives of approximately 60,000 non-management employees of certain Bell System operating companies,[9] that these labor organizations are parties to collective bargaining agreements with the aforementioned operating companies, and that certain provisions of those collective bargaining agreements are directly affected by the January 18, 1973 Memorandum of Agreement between the government plaintiffs and AT&T and by the Consent Decree entered by this Court on the same day. The Alliance further alleges that the defendant operating companies, purportedly acting pursuant to the terms of the Consent Decree, have violated their collective bargaining agreements with the Alliance's member organizations, the established past practices of the parties to those agreements, and Part B, Section II, Paragraph D of the Consent Decree. Specifically, the Alliance charges that: (1) the operating companies have instituted promotion and transfer policies that disregard the seniority of employees represented by the Alliance's members, thus violating the relevant collective bargaining agreements, Part A, Section III of the Consent Decree, and § 703(h) of the Civil Rights Act of 1964; (2) the operating companies have preferentially treated employees in promotions and transfers solely on the basis of race and sex and without regard to seniority, thus violating the relevant collective bargaining agreements in circumstances not required by the Consent Decree, and violating Title VII of the Civil Rights Act of 1964 as well; (3) the operating companies have filled vacancies with new hires rather than through the promotion or transfer of employees with seniority and the requisite ability, in violation of the relevant collective bargaining agreements, of past practices under those agreements, of the spirit and intent of the Consent Decree, and of the requirements of law; (4) the operating companies have limited the number of transfer or promotion applications an individual may file, thus violating established past practices under the relevant collective bargaining agreements, the agreements themselves, and the spirit and intent of the Consent Decree; (5) the operating companies have placed departmental and geographical limits on transfers and promotions; (6) the operating companies have set up time-in-title requirements for promotion that are more restrictive than the provisions of the relevant collective bargaining agreements and the past practices of the parties under those agreements, and that violate Part A, Section III, Paragraph D of the Consent Decree; and (7) the operating companies have imposed testing requirements for promotion, many of which bear little or no relationship to the promotion sought. The Alliance contends that all of those actions violate the spirit and intent of the Consent Decree and are required neither by the Decree nor by applicable federal law, and that the same actions violate both the relevant collective bargaining agreements between the parties and the past practices of the parties under those agreements. According to the Alliance, a number of its member organizations have diligently defended their contractual rights by filing grievances, by demanding arbitration, and by encouraging adversely affected employees to file complaints with the EEOC. To acquiesce in the aforementioned actions of the operating companies, says the Alli-

---

**8.** Since IBEW's Motion for Summary Judgment makes no new allegations and seeks the identical relief requested in IBEW's original petition to modify the Consent Decree, I need not, and do not, review it in detail here.

**9.** Those operating companies are Southern New England Telephone Company, Bell Telephone Company of Pennsylvania, New York Telephone Company, Diamond State Telephone Company, and Illinois Bell Telephone Company.

ance, would breach the duty of fair representation it owes to its members, would constitute a failure to enforce the anti-discrimination provisions of its collective bargaining agreements, and would leave it vulnerable to charges that it had actively participated in or passively accepted discriminatory practices that violate federal law.

In its prayer for relief, the Alliance asks that the Consent Decree be modified to provide that: (1) transfers and promotions by the operating companies be made in accordance with the relevant collective bargaining agreements and the past practices of the parties under those agreements, and without granting preferential treatment to any individual or group on the basis of their race, color, religion, sex or national origin; (2) maternity leave be treated like any other absence for temporary disability in the computation of seniority under those collective bargaining agreements and under the employee benefit plans of the operating companies; (3) the Decree not be construed to demand the imposition of time-in-title requirements for transfer and promotion; and (4) no employee of the operating companies be disqualified from transfer or promotion for failure to pass a Bell System Qualification Test that is not directly related to the job for which transfer or promotion is sought.

### 4. The Claims of the Government Plaintiffs and AT&T

#### A. The Interim Report

In support of their joint motion to enter the proposed Supplemental Order, the Government plaintiffs and AT&T filed an Interim Report on the implementation of the Consent Decree. The report states that, after the entry of the decree, the plaintiffs established a Government Co-ordinating Committee (GCC), AT&T enlarged its Human Resources Development Department (HRD), and the GCC and the HRD worked together to assure defendants' compliance with the decree. The report further states that while numerous problems were encountered in 1973, in particular the development of a suitable compliance procedure, the defendant operating companies made substantial progress in fulfilling their obligations under the decree. Nevertheless, the GCC determined that, on the basis of reports submitted to it and of its own on-site reviews, many of the operating companies had not met their intermediate targets for the placement of members of previously underutilized groups. The GCC attributed these deficiencies to (1) ineffective management control of the program in some operating companies; (2) initially inefficient monitoring procedures; (3) insufficient use by the defendants of the affirmative action override,[10] (4) inadequate recruitment efforts among previously underutilized groups; and (5) the failure to adopt the alternate selection procedures where test disqualifications of job applicants from underutilized minority groups had made it more difficult to meet intermediate employment targets for such groups.

During discussions with the defendants of methods to improve on their 1973 performance, the GCC reviewed their compliance with the decree in 1974 and found it significantly improved, 90% of the 1974 intermediate targets having been achieved by the defendant operating companies. The GCC therefore concluded that no on-site reviews were required to monitor the defendants' 1974 performance. The Government plaintiffs and AT&T then agreed upon a supplemental action program in which target per-

---

10. The GCC concedes that the filing of employee grievances discouraged the use of the override in 1973, and has supplied the defendants with a letter confirming defendants' obligation, under Title VII, Executive Order No. 11246, and the Consent Decree, to use the override to achieve their intermediate targets under the decree. See Interim Report at 4 fn. 2, and Appendix C to the proposed Supplemental Order. The intervenors correctly point out that the government plaintiffs acted less than speedily on defendants' request for a formal opinion on the relationship between the seniority override and the demands of federal law. AT&T's letter of inquiry was dated March 6, 1974. The plaintiffs' one and one-half page response was dated May 6, 1975, fourteen months later.

formances for 1973, 1974 and part of 1975 would be aggregated.[11]

This supplemental action program included two adjustments in 1973 target performance. Given the unanticipated difficulties encountered by the operating companies in placing women in outside craft jobs, the parties agreed that performance for such placements would be evaluated on the basis of the acknowledged good faith efforts made by certain operating companies to achieve those targets. The parties also agreed that in the present state of the economy an affirmative action program should not provide a disproportionate number of job opportunities to individuals who are not members of minority groups. The 1973 and 1974 targets in certain job classifications were therefore adjusted to provide comparable opportunities for both minority and non-minority employees and applicants.

At the close of this Interim Report, the government plaintiffs and AT&T jointly moved the Court to enter the proposed Supplemental Order pursuant to its retained jurisdiction under Part B, Section IV, Paragraph A of the Consent Decree.[12]

B. The Proposed Supplemental Order

The Proposed Supplemental Order (hereinafter "PSO") includes carry forward provisions to correct previous deficiencies; provisions for financial compensation to specific individuals and for financial contributions by the defendants to a Bell System Affirmative Action Fund, along with examples of the projects to which the fund may be applied; provisions to compensate for test disqualifications of otherwise qualified candidates for job opportunities; an articulation of the affirmative action override, of

the situations in which the defendants shall employ it, and of the steps to be taken if the override is modified in any way by the courts; provisions stating the effect of the PSO, including its impact on any Bell Company's collective bargaining agreements; provisions for the determination of compliance with the PSO; provisions setting forth procedures for compliance with the PSO; provisions for recordkeeping by the defendants and for their reporting to the Government plaintiffs under the Consent Decree and the PSO; and, finally, a provision setting forth the effective term of the PSO. The PSO also incorporates three appendices: Appendix A sets forth the operating companies' deficiencies for 1973 and 1974, and the method by which the deficiencies were determined; Appendix B lists the actions the operating companies must take in order to comply with their obligation to make good faith efforts to place women in certain non-traditional jobs; Appendix C is a letter, dated May 6, 1975, from the Government plaintiffs to the defendants, describing the operation of the affirmative action override and stating that its use is required by federal law and that it prevails over any conflicting provision of a Bell System collective bargaining agreement.

For purposes of the petitions and motions presently before the Court, the most important provisions of the PSO are Part I, the carry forward procedure, and Part IV, the affirmative action override. Part I.A provides for the proration by job classification of 1973 deficiencies in performance to establishments that were themselves deficient in placing members of protected race, sex, and ethnic groups in the appropriate job

---

11. The agreement in no way constituted an admission by the defendants that they had not complied with the Consent Decree in 1974 and 1975.

12. That portion of the decree provides:

IV. DURATION OF THE DECREE

A. The Court retains jurisdiction of this action for entry of such orders as are necessary to effectuate the provisions of this Decree. The term of this Decree shall be six years from this date, but as to the issues in PART A, Sections VI, VII and VIII, the Defendants are permanently enjoined from violating the provisions of the Equal Pay Act. Upon certification to this Court that the payment of back wages ordered in PART A, Section VIII, have been made; that portion of this Decree will be dissolved as having been satisfied. Defendants waive none of their rights to move for dissolution or modification of this Decree at any time in addition to those specifically provided for in Section IV.B (2), below.

classifications during 1973. Part I.B, insofar as it concerns us here, spells out a placement procedure for non-management employees and applicants in job classifications 5–15 for those establishments that did not meet their 1973 targets. Under this procedure, employees or applicants from deficient groups will receive priority in placement if they had on file in 1973 an application for employment, upgrade or transfer for the same job title they now seek,[13] if they have not yet received an offer of employment in response to that application and are currently available for employment or assignment, and if they are qualified for the job that is open.[14] Part I.B of the PSO states further that in any calendar quarter where the process of priority placement described above fills less than 50% of the deficiencies in a particular establishment's deficient classification(s), additional qualified employees or applicants from the deficient group(s) will receive priority placement until the total number of priority placements equals 50% of the deficiencies at the start of the quarter or 50% of the projected job opportunities for the quarter, or until the deficient group achieves its ultimate employment goal under the decree. Should deficiencies continue in a particular establishment where the pools of qualified employees or applicants from deficient groups identified above have been exhausted, each race, sex or ethnic group that is still deficient will share proportionately in the remaining job opportunities, subject to certain limitations not relevant here. Part I.B additionally provides for the termination of the carry forward procedure when a formerly deficient group reaches ultimate goal, and directs the operating companies to notify the Government plaintiffs whenever, in a particular calendar quarter, placements to groups at ultimate goal exceed one-third of the placements in a job classification with deficiencies. Part I.C. of the PSO directs all defendants with carry forward obligations to make all placements in accordance with the Part I.B procedures. Where there are no deficiencies or where they have been eliminated, the defendants must make placements in accordance with goals II percentage allocations. Part I.D of the PSO directs operating companies to make all placements for a specified time period—from shortly after the entry of the PSO until the effective date of the carry forward procedures—from deficient groups, to the extent that qualified members of those groups are available or until the deficiencies are eliminated. Finally, Part I.E of the PSO provides that an operating company which has, for two consecutive calendar quarters, made more than one-third of its placements in a particular job classification to groups at ultimate goal may petition the Government plaintiffs and, eventually, this Court for a reduction of the remaining deficiencies in that job classification.

Part IV of the PSO sets forth the affirmative action override. In pertinent part, it provides that, while contractual criteria for the selection of candidates for promotion remain generally in effect, "to the extent any Bell System operating company is unable to meet its intermediate targets in job classifications 5–15 using these criteria, the Decree requires that . . . selections be made from among any at least basically qualified candidates for promotion and hiring of the group or groups for which the target is not being met and in accordance with any applicable selection criteria in a collective bargaining agreement or pursuant to Bell System operating company practices as among such candidates."

Part IV further provides that "Bell System Companies shall employ the affirmative action override described . . . above, in any job classification and establishment (a) at any point in a quarter when they conclude that such use is necessary to meet intermediate targets or (b) in quarters

---

**13.** They will also be consulted about whether they desire to extend their application to other job titles in the same job classification or to other locations within the same establishment.

**14.** In this context, individuals who are not entitled to priority placement, even though they are substantially better qualified than individuals entitled to such placement, may not be placed ahead of the latter.

following the end of any quarter when a Company is failing to meet any intermediate target in such classification and establishment and until such target is being met for the year."

## IV

## THE MERITS OF THE PETITIONS TO MODIFY OR SUPPLEMENT THE CONSENT DECREE

### A. Preliminary Considerations

1. Promotions and Seniority [15] in the Bell System.

■ While I fully realize the importance of seniority to union members, privileges based upon it have not yet acquired the status of constitutional rights. An examination of Bell System employment practices makes this abundantly clear. In the Bell System, management makes all the hiring decisions, Affidavit of Richard W. Hackler, Doc. # 88, ¶ 10, and AT&T's overriding policy has traditionally been that "management retains the prerogative to transfer and promote consistent with the needs of the business." Id., ¶ 4. Thus, in the relevant collective bargaining agreements, there is no absolute entitlement based on seniority. See Affidavit of Oliver R. Taylor, Doc. # 86, Appendix VI, ¶ 4. Seniority is one, but not the only, consideration in transfers and promotions; it usually functions as "a method of selecting between candidates of equal or approximately equal qualifications." Hackler Affidavit, Doc. # 88, ¶ 4. More specifically, the role of seniority in filling vacancies in Bell System operating companies is as follows:

> "Among employees competing for promotion opportunities, the standard calls for selection of the best qualified employee and for consideration of net credited service (company-wide seniority). Where qualifications are substantially equal, net credited service governs."

Doc. # 75, at 7, and Attachment III; see Doc. # 77, at 5.

The CWA has described this "best qualifications" criterion for filling vacancies as governed by the subjective judgment of management. See Doc. # 65, at 8; Doc. # 77, at 6.

■ The intervenors' horror at an override of seniority would lead one to believe that it is an unprecedented departure from past practices within the Bell System. It is not. Consistent with the very collective bargaining agreements that intervenors claim are violated by the override, the defendants have always had the authority to fill, and have from time to time filled, vacancies in jobs above the entry level with new hires or with better qualified, low seniority employees, even though employees with greater seniority were by-passed in the process. Affidavit of Oliver R. Taylor, Doc. # 86, Appendix VI, ¶ 4. This practice was, in essence, a seniority override for reasons of business efficiency. In the instant case, the seniority override is used for a far more important and compelling purpose, the implementation of a significant national policy, the assurance of equality of employment opportunity, as expressed by the national legislature in Title VII and by the national executive in Executive Order No. 11246.

### B. Agency Interpretations

■ The EEOC, the agency charged with the enforcement of Title VII, and the Department of Labor, the agency charged with the implementation of Executive Order No. 11246, are parties to the Consent Decree and the Proposed Supplemental Order. Obviously, they judge the relief provided in the decree and the proposed order to be fully consistent with Title VII and the executive order respectively, and their judgments should not be lightly disregarded by the courts. As the Supreme Court has said, referring specifically to the EEOC, "[t]he administrative interpretation of the

---

15. The "bona fides" of the defendants' seniority system are not at issue in this proceeding. Defendants say the system is bona fide, Doc. # 83, at 6 n. 12, 7–8; the intervenors' objections to the override are premised on that proposition; and the government plaintiffs are silent about it.

Act by the enforcing agency is entitled to great deference." *Griggs v. Duke Power Company,* 401 U.S. 424, 433–34, 91 S.Ct. 849, 854, 28 L.Ed.2d 158 (1971). The court of appeals for this circuit has stated that the Labor Department's interpretation of Executive Order No. 11246 should be accorded similar respect. *Contractors Association of Eastern Pennsylvania v. Secretary of Labor,* 442 F.2d 159, 175 (3d Cir.), *cert. denied,* 404 U.S. 854, 92 S.Ct. 98, 30 L.Ed.2d 95 (1971). While neither of these agency interpretations completely forecloses judicial inquiry into the validity of the Consent Decree and the Proposed Supplemental Order, they nevertheless weigh heavily in support of a finding that both the decree and the proposed order are proper exercises of this Court's remedial powers.

C. The Evidentiary Posture of the Case

■ Because the defendant-intervenors challenge a consent decree and its implementation, the instant case comes before the Court in an unusual evidentiary posture. In their complaint, the government plaintiffs alleged that AT&T had discriminated against women and minority employees in promotions and transfers by a variety of policies and practices. See Doc. # 1, ¶ 14, (a)–(g). According to the government, AT&T's vaguely defined transfer and promotion procedures were not made known to women and minority employees; women and minority employees were placed in job categories where there were disproportionately limited opportunities for upward mobility and advancement as compared to jobs staffed predominately by Caucasian males; AT&T did not provide women and minority employees with equal opportunities for training as compared with Caucasian males; AT&T failed to promote women and minority employees in non-management job cate-

gories at a rate comparable to Caucasian males; AT&T preferred new hires over current employees seeking to transfer to higher-paying non-management jobs; AT&T failed to promote women and minority employees into management jobs at a rate comparable to Caucasian males; and AT&T used "net credited service" to determine lay-off and recall rights to the disadvantage of women and minority employees. In its answer, filed the same day, AT&T denied each of these allegations in their totality except the last, and then denied that its use of "net credited service" to determine lay-off and recall rights had in fact disadvantaged women and minority employees. Answer of AT&T, Fourth Defense, Doc. # 2, at 4. Still on the same day, January 18, 1973, the parties entered into a consent decree which provided for extensive changes in AT&T's promotion and transfer policies. That consent decree, however, stated that its provisions constituted neither an admission by the defendants nor a finding by this Court that the defendants had in fact discriminated against women and minority employees as the complaint alleged. See Consent Decree, Doc. # 3, at 1–2.[16]

■ To achieve the equality of employment opportunity that is the goal of Title VII, Congress selected cooperation and voluntary compliance as "the preferred means." *Alexander v. Gardner-Denver Company,* 415 U.S. 36, 44, 94 S.Ct. 1011, 39 L.Ed.2d 147 (1974). That these "preferred means" might be used effectively, it created the EEOC and established procedures by which the Commission could "settle disputes through conference, conciliation, and persuasion" prior to litigation. Id. The termination of litigation through settlement is, of course, a judicially favored way of dis-

---

**16.** Such a disclaimer of liability is, of course, a standard feature in consent decrees. The defendant denies that it has done anything wrong, then promises not to do it again. Nevertheless, it is clear that the failure of a party to a consent decree to admit liability for alleged misconduct does not affect the validity of the consent decree itself. *Swift & Co. v. United States,* 276 U.S. 311, 327, 48 S.Ct. 311,

72 L.Ed. 587 (1928). The instant defendants candidly admit that the absence of proof of actual discrimination and their denial of such discrimination are immaterial. They rightly point out that very few consent decrees would be negotiated if an admission of liability by the defendants was a *sine qua non.* Doc. # 79, at 9 n. 20.

posing of litigation. *Petty v. General Accident Fire & Life Assurance Corp.*, 365 F.2d 419, 421 (3d Cir. 1966). *Accord: Stanspec Corporation v. Jelco, Inc.*, 464 F.2d 1184, 1187 (10th Cir. 1972); *State of West Virginia v. Chas. Pfizer & Co.*, 440 F.2d 1079, 1085 (2d Cir.), *cert. denied*, 404 U.S. 871, 92 S.Ct. 81, 30 L.Ed.2d 115 (1971).

■ The intervenors, however, seek to eviscerate the Consent Decree, and their attack on the decree has arguable legal merit only because the decree was formulated through a process that fully complied with the express intent of the Congress. If this case had gone to trial, and if the Government plaintiffs had proved, as they alleged in their complaint, that AT&T had in fact discriminated against women and minority employees in its promotion and transfer policies, it is clear that this Court would have had the equitable power to fashion an appropriate remedy for that discrimination, i. e., to order affirmative action in promotions and transfers. See *Patterson v. Newspaper and Mail Deliverers' Union of New York and Vicinity*, 514 F.2d 767, 775 (2d Cir. 1975); *Schaefer v. Tannian*, 8 EPD ¶ 9605 (E.D.Mich.1974); *N.A.A.C.P. v. Civil Service Commission*, S.F., 6 EPD ¶ 8956 (N.D.Cal.1973). It would surely be incongruous if the use of Congressionally preferred means to achieve a Congressionally desired result would leave that result vulnerable to attack on the ground that the Congressional intent had been violated. Yet that is precisely the kind of ruling that the intervenors seek from this Court.

They conveniently overlook both the general judicial preference for settlement of litigation and the specific Congressional preference for settlement of Title VII litigation.

They appear to say that because no evidence of discrimination was produced here, there was no evidence of discrimination to be introduced. This implicit argument suffers from the same ahistoricity that flaws

so many of intervenors' arguments. It ignores, for example, the administrative proceedings before the Federal Communications Commission concerning the same charges alleged in the instant complaint. Those proceedings lasted for more than a year, involved approximately 60 days of hearings, at which 150 witnesses testified and over 200 exhibits were introduced into evidence, and produced a record of more than 8,000 pages.[17] I took specific note of these proceedings in my earlier opinion in this case. 365 F.Supp. at 1109, 1114.

Indeed, the intervenors themselves have introduced evidence that would tend to support a finding of sex discrimination within the Bell System. See Affidavit of Richard W. Hackler, Assistant to the President of CWA, Doc. # 88, ¶ 9 (traditional job classifications according to sex), ¶ 10 (pay differentials between traditionally male and traditionally female jobs), ¶ 13 (infrequency of transfer into traditionally male craft jobs or into traditionally female operator and clerical jobs).

■ Ultimately, however, I do not rest my rejection of intervenors' evidentiary contentions on the presence in the record of some evidence of racial and sexual discrimination by defendants. A federal court, when it reviews the settlement of an employment discrimination action, may not disregard the public policies embodied in Title VII. See *Rios v. Enterprise Association Steamfitters, Local 638*, 501 F.2d 622, 628 n. 4 (2d Cir. 1974). Moreover, as the court of appeals for the Second Circuit has said in a case substantially similar to the instant action:

"the clear policy in favor of encouraging settlements must also be taken into account, see *Florida Trailer & Equipment Co. v. Deal*, 284 F.2d 567, 571 (5th Cir. 1960), particularly in an area where voluntary compliance by the parties over an extended period will contribute signifi-

---

**17.** For some of the statistical data developed during these proceedings that the government plaintiffs were prepared to rely on here, see Doc. # 86, Appendix III (sex-segregated job titles in the Bell System); id., Appendix IV (distribution of blacks in major Bell System job titles); id., Appendix V (average wages for black and white employees in the Bell System).

cantly toward ultimate achievement of statutory goals."

*Patterson v. Newspaper & Mail Deliverers' Union of New York and Vicinity,* 514 F.2d 767, 771 (2d Cir. 1975). Both considerations are especially relevant to the instant case, where the compliance of the parties, achieved through settlement, will make a significant contribution to the achievement of the goals of Title VII.

■■■ As I said in my earlier opinion, 365 F.Supp. 1105, *passim,* the Consent Decree in the instant case eminently accomplishes the purposes of Title VII. Since it is the product of cooperation and voluntary (though possibly grudging) compliance, it is a particularly striking example of the successful use of the means preferred by Congress for the achievement of Title VII's goals. In my judgment, then it would frustrate the purposes of Title VII to treat the absence of evidence about AT&T's discrimination in transfer and promotion policies, and AT&T's denial of liability for such discrimination, as insuperable obstacles to the ordering of affirmative action in transfers and promotions. I decline to do so. For the remainder of this opinion, therefore, I shall treat the allegations of the complaint with respect to transfer and promotion as if

they had in fact been proved at trial. To approach them in any other way would make a mockery of the "preferred means" chosen by Congress to effectuate the goals of Title VII.

B. The Affirmative Action Override [18]

1. *Does the Affirmative Action Override Violate the Consent Decree?* [19]

The affirmative action (or seniority) override whose legality is the central issue in this proceeding is set forth in Part IV of the PSO. See p. 21, supra. The government plaintiffs state that the Consent Decree of January 18, 1973 provides for the application of this override, that its application is required by the Consent Decree, and that the override prevails whenever it conflicts with the provisions of a Bell System Collective bargaining agreement. See Letter of May 6, 1975, Attachment I to Doc. # 75.

The threshold question raised by the Intervenors, specifically by CWA, is whether the affirmative action override violates the terms of the Consent Decree that purportedly contains it. [20]

CWA argues generally that the defendants have violated Part B, § II, ¶ D of the

---

**18.** As I have noted previously, see n. 2 supra, the intervenors' principal objections to the Consent Decree apply to the Proposed Supplemental Order as well, since the order, if entered, would continue the promotion and transfer policies established by the decree, the Memorandum of Agreement, and their appendices. My discussion of these primary objections will therefore apply to both the decree and the proposed order. The final portion of this section of the opinion will be devoted to a consideration of intervenors' other objections to the decree and the proposed order.

**19.** The affirmative action program established by the Consent Decree applies to eleven (11) non-management job classifications (Nos. 15–5):

15. Service Workers
14. Operators
13. Office Clerical—Entry Level
12. Office Clerical—Semiskilled
11. Office Clerical—Skilled
10. Telephone Craft—Semiskilled–Inside
9. Telephone Craft—Semiskilled–Outside
8. General Services—Skilled

7. Telephone Craft—Skilled–Inside
6. Telephone Craft—Skilled–Outside
5. Sales Workers

See Consent Decree, Part A, § VI. Part A, § III, of the decree makes specific provision for transfers or promotions into classifications 9, 10, 6 and 7. See ¶¶ A, B. It does not specifically refer to transfer or promotions into any of the other seven job classifications.

**20.** IBEW and the Alliance, while they state that the override is not clearly articulated in the decree, do not claim that the override is itself a violation of the decree. Indeed, the CWA itself would appear to have withdrawn its claim that the seniority override violates the Consent Decree. See Doc. # 87, at 5 ("The quotas [goals and timetables in the jargon of the Government plaintiffs] were negotiated between the Government and AT&T on the basis that seniority override was available as a tool for their accomplishment."). In the absence of a specific withdrawal of the claim, however, I shall proceed as though CWA continues to press it.

Consent Decree. Doc. # 65, ¶ 3. That portion of the Decree provides that:

"D. This Decree shall not be interpreted as requiring the abandonment of any provisions in any Bell Company's collective bargaining agreement(s) except as required to maintain compliance with Federal law, Executive Orders and regulations promulgated pursuant thereto pertaining to discrimination in employment. All of the Bell Companies' obligations in this Decree are required for compliance with Federal law; provided, however, that nothing in this Decree is intended to restrict the right of the Bell Companies and the collective bargaining representatives of their employees to negotiate alternatives to the provisions of this Decree which would also be in compliance with Federal law.

"To the extent that any Bell Company has in effect a posting and bidding system, said system shall continue to be used. Provided, however, that such system will be modified to the extent necessary to conform with Part A, Section III of this Decree.

"Each Bell Company shall notify all appropriate collective bargaining representatives of the terms of this Decree and of its willingness to negotiate in good faith concerning these terms."

More specifically, CWA charges that the affirmative action override violates Part A, § III of the Consent Decree. Doc. # 65, ¶ 3.A. That portion of the Decree provides that:

## "III. TRANSFER, PROMOTION, LAYOFF AND RECALL

"A. Each Bell Company shall offer each of its female and minority employees in nonmanagement, noncraft jobs who has four or more years of net credited service on July 1, 1971, and who expresses a desire for transfer as required by the appropriate upgrading and transfer plan or posting and bidding system to a job in AAP job classification 9 or 10, an opportunity to compete therefor with other employees on the basis of net credited service and basic qualifica-

tions, as set forth in Appendix C, if females or minorities currently are underutilized in such AAP classification 9 or 10 and such employee is a member of the group which is underutilized. For purposes of this Decree, 'net credited service' shall mean total length of service with the operating company in which the vacancy occurs. Provided, however, that total length of service within the Bell System shall continue to be used for other purposes, including bridging rights, consistent with the provisions of the applicable Bell Company's collective bargaining agreement(s).

"Provided further, each Bell Company and each collective bargaining representative of their employees shall be free to bargain to expand this definition of net credited service, for purposes of this Agreement, to mean total length of service with the Bell System.*

* Employees returning from maternity leave do not have their service broken (absence in excess of 30 days will be deducted from net credited service).

"Where the term net credited service is presently defined in applicable collective bargaining agreements as length of service greater than that of the company into which the employee was last hired, definition of that term shall be unaffected by this paragraph.

"B. In filling vacancies in AAP job classifications 6 and 7, candidates for promotion shall be evaluated on the basis of net credited service and best qualified, unless a lower standard of qualification is provided in a collective bargaining agreement or pursuant to Bell Company practices. However, if any Bell Company is unable to meet its intermediate targets within the stated time frames using these criteria, it will use only the criteria of net credited service and a basic qualified criterion and, if necessary, will seek new hires who meet at least the basic qualified criterion. Efforts to achieve intermediate targets should be substantially uniform throughout the appropriate time frame. Each Bell Company agrees to notify the appropriate collective bargaining

representative of its employees prior to promoting or transfering persons in AAP job classifications 6 and 7 on the basis of net credited service and basic qualifications.

"C. Net credited service shall be used for determining layoff and related force adjustments and recall to jobs where non-management female and minority employees would otherwise be laid off, affected or not recalled. Collective bargaining agreements or Bell Company practices shall govern the confines of the group of employees being considered. Provided, however, vacancies created by layoff and related force adjustments shall not be considered vacancies for purposes of transfer and promotion under this Section.

"D. Minimum residence (time in title) requirements shall not be greater than the following, in the major job titles noted below:

1. Clerical, six-twelve months time in title;
2. Operator, six-twelve months time in title;
3. Service Representative, fifteen-eighteen months time in title;
4. Lower and Middle Craft, fifteen-eighteen months time in title;
5. Top Craft (Switchman, PBX Installer, PBX Repairman, Toll Test man, etc.), twenty-four–thirty months time in title.

"Collective bargaining agreements of company practices which provide lower minimum residency requirements than those outlined above shall continue in effect."

Finally, CWA alleges that defendants' imposition of time-in-title requirements upon the eligibility of employees for promotion violates Part A, § III, ¶ D of the Consent Decree.[21] Doc. # 65, ¶ 3.F.

Even if CWA's arguments are not wholly without merit, they are ultimately unpersuasive. In the first place, it is incontesta-

ble that everyone presently involved in this litigation knew full well that the Consent Decree would modify the intervenors' collective bargaining agreements with defendants. A careful reading of my original opinion in this case, 365 F.Supp. 1105, reveals that (1) conflict between the Consent Decree and relevant collective bargaining agreements was anticipated, id. at 1118–19, n. 21, and (2) unilateral revisions of the relevant collective bargaining agreements were also anticipated, id. at 1111, 1129. The intervenors can scarcely claim surprise about the override provisions since, for several months prior to the entry of the consent decree, both the CWA and the IBEW had known that any settlement between AT&T and the government would involve modification, pursuant to an affirmative action plan, of Bell System promotion and transfer policies. Id. at 1114–17. In fact, just two days before the decree was entered, CWA had demanded "immediate negotiations" with AT&T to discuss, among other issues, transfer plans and promotional pay plans. Id. at 1111. The Court of Appeals for the Third Circuit also recognized that the Consent Decree would modify the intervenors' collective bargaining agreements with defendants, and based its grant of intervention squarely on the intervenors' interest in contesting those modifications. 506 F.2d at 741–42.

While it was therefore obvious that the Consent Decree would require some modification of the relevant collective bargaining agreements, the exact form this modification would take was not nearly so well defined. The government plaintiffs and the defendants maintain that the seniority override is clearly articulated in Part A, § III, ¶ B of the Consent Decree. I disagree. By its terms, that subsection refers only to two of the 11 job classifications covered by the decree. While it permits the defendants, if they are not meeting their placement goals, to seek basically qualified new hires for those two job classifications,

---

**21.** The text of this portion of the decree is set forth immediately above. Since CWA admits that time-in-title requirements are bargainable, I shall reserve my treatment of this allegation until that portion of this opinion which concerns other issues that are proper subjects for collective bargaining. See p. 67, infra.

it does not say that the defendants may, or are required to, override seniority in any of the other nine job classifications. If the language of that subsection was the only basis for the position of the government plaintiffs and the defendants, I would find it difficult to conclude, as a matter of law, that the seniority override, as it has been employed by the defendants during the life of the decree, was contemplated in the decree. Fortunately for the parties who contend that the override does not violate the decree, their position does not stand or fall with Part A, § III, ¶ B of the decree.

■■■ The parties to the Consent Decree certainly understood that the affirmative action override would be used where necessary to enable the defendants to meet their obligations under the Consent Decree. See Affidavit of David A. Copus, Doc. # 75, Attachment 1, ¶¶ 7–11; Affidavit of Lee A. Satterfield, Appendix to Doc. # 79, ¶ 4; Affidavit of Donald E. Liebers, Doc. # 82, ¶ 3. Part A, § III, ¶ C of the decree, which specifically provides that seniority shall govern layoffs and recalls, lends further support to the inference that the decree authorized the defendants, in other situations, to override seniority. So does the subsequent conduct of the parties, which is yet another indication of their understanding of the defendants' obligations under the Consent Decree. See, e. g., United States v. Atlantic Refining Company, 360 U.S. 19, 23–24, 79 S.Ct. 944, 3 L.Ed.2d 1054 (1959); United States v. Associated Credit Bureaus, Inc., 345 F.Supp. 940, 946 (E.D.Mo. 1972). Since the entry of the decree, the defendants have used the affirmative action override to fill thousands of vacancies. Affidavit of Donald E. Liebers, Doc. # 82, Table I. Where the defendants have failed to meet the placement goals established by the Consent Decree, the government plaintiffs have identified insufficient use of the seniority override as one of the causes of the failure. Interim Report, Doc. # 73, at 4. Where the defendants' failure to meet those placement goals was attributed to insufficient use of the seniority override, the government plaintiffs alleged that the defendants had failed to comply in good faith with the Consent Decree. Affidavit of Donald E. Liebers, Doc. # 82, ¶ 4.

These are not the only indications that the override is consistent with the Consent Decree. The Memorandum of Agreement between the parties to the decree incorporated as exhibits a model affirmative action program, a model upgrading and transfer plan ("MUTP"), and model job briefs and qualifications; its terms obliged AT&T to strive to implement these model plans and programs. Further support for the contention that the affirmative action override was within the contemplation of the Consent Decree is provided by the Model Affirmative Action Program. In pertinent part, Part I, § C reads as follows:

"The Equal Employment objective for the Bell System is to achieve, within a reasonable period of time, an employee profile, with respect to race and sex in each major job classification, which is an approximate reflection of proper utilization.

. . . . .

"This objective calls for achieving full utilization of minorities and women at all levels of management and non-management and by job classification *at a pace beyond that which would occur normally*;
. . ." *(emphasis supplied)*

Since the normal method of employee progression within the Bell System involves adherence to the contractual standard of seniority or net credited service, the objective to which the defendants committed themselves in the Model Affirmative Action Plan obviously required some departure from that standard, in other words, a seniority override.

CWA has argued that the defendants' application of § 9.1 of the MUTP is incompatible with Part A, § 1 of the decree and ¶ 3.1 of the MUTP. Having examined both cited provisions in the total context of the decree, the Memorandum of Agreement and the decree's appendices, I find no such incompatibility. Indeed, I find that the MUTP itself lends additional support to the position of the plaintiffs and defendants

that the seniority override does not violate the decree.

The MUTP, an appendix to the Consent Decree and incorporated therein, see Consent Decree, Part A, § 1, provides in pertinent part:

"9. *Selection*

9.1 When qualifications are substantially equal, the senior net credited service employee will be selected. If the requisition has indicated an Affirmative Action deficiency the Transfer Bureau will give appropriate consideration in determining candidates."

In my judgment, this provision can only be construed as authorizing departure from other selection standards, see MUTP ¶ 8.1, in order to correct outstanding deficiencies. Nevertheless, the CWA contends, Doc. # 77, at 10–14, that the defendants' application of this provision has limited consideration for vacancies where there are affirmative action deficiencies only to members of deficient groups, and that such a limitation is not authorized by the Consent Decree. The CWA's position, however, is based on a curious reading of the decree. It concedes, as it must, that the decree and its appendices are to be read together, for the decree, by its terms, clarifies and amplifies the appendices. It then examines certain affirmative action provisions of the decree, finds that they do not say precisely what § 9.1 of the MUTP says, and concludes that the application of § 9.1 is not authorized by the decree. According to this interpretation of the decree, nothing in its three appendices would be authorized unless specifically reaffirmed in the body of the decree. Obviously, this interpretation would render the appendices, an integral part of the decree, virtually meaningless, and I therefore decline to adopt it.

CWA understandably discusses in detail the findings of Arbitrator Lewis Gill in a proceeding that challenged the MUTP, since those findings supported CWA's view of the Consent Decree's requirements. See Doc. # 87, at 11–14. Subsequently, however, on cross-motions to vacate/enforce Arbitrator Gill's award, this Court held that he should not have considered the applicability of the Consent Decree in rendering that award. *Federation of Telephone Workers of Pennsylvania v. Bell Telephone Company of Pennsylvania,* 406 F.Supp. 1201 (E.D.Pa.1975). Accordingly, Arbitrator Gill's construction of the Consent Decree is no longer relevant to the instant case.

■ Having carefully examined the Consent Decree, the Memorandum of Agreement, their appendices, and the affidavits submitted by the parties to the decree, I conclude that the seniority or affirmative action override was within the contemplation of the decree. Accordingly, intervenors' initial objection to the use of the override to achieve the goals and timetables established by the decree must be rejected.

2. *Does the Affirmative Action Override Violate the Constitution of the United States?*

■ The intervenors further claim that the seniority override, because it confers a preference on individuals that is based on their race, sex or national origin, is a denial of the equal protection of the laws and thus violates the Due Process Clause of the 5th Amendment. They rely on *Bolling v. Sharpe,* 347 U.S. 497, 74 S.Ct. 693, 98 L.Ed. 884 (1954), which declared racial segregation in the Washington, D.C. public schools unconstitutional and held that in some instances discrimination can be so unjustifiable as to be violative of due process, and on *Griggs v. Duke Power Company,* 401 U.S. 424, 91 S.Ct. 849, 28 L.Ed.2d 158 (1971), which they read to prohibit any preference for individuals based on their race, sex or national origin. Unfortunately for the intervenors, numerous courts have considered and rejected the arguments the intervenors make in the instant case. Again and again, in the employment discrimination context, these courts have held that the Constitution does not bar remedial orders granting a limited preference to members of groups that have previously been discriminated against. See *Rios v. Enterprise Association Steamfitters Local 638,* 501 F.2d 622, 628–30 (2d Cir. 1974), and

cases cited therein.[22] The intervenors' reliance on *Griggs v. Duke Power Company, supra,* is surely misplaced, for the language they cite, 401 U.S. at 430–31, 91 S.Ct. 849, defines what is a violation of Title VII. It does not, nor does it purport to, address itself to what constitutes a proper remedy for employment discrimination. In this connection, see especially *Carter v. Gallagher, infra,* where the court of appeals for the Eighth Circuit exhaustively studied the issue of whether *Griggs* required that a limited remedial preference for members of groups that had previously been discriminated against be held unconstitutional, and concluded that it did not. 452 F.2d at 327–31.

█ The IBEW further contends that race-conscious remedies incorporating numerical ratios are unconstitutional outside the school desegregation context, which in the IBEW's submission is *sui generis.* That is not the opinion of at least four Courts of Appeals. See *Rios v. Enterprise Association Steamfitters Local 638, supra,* 501 F.2d at 628; *NAACP v. Allen,* 493 F.2d 614, 617–19 (5th Cir. 1974); *United States v. International Brotherhood of Electrical Workers, Local Union No. 212,* 472 F.2d 634, 635–36 (6th Cir. 1973); and *Carter v. Gallagher,* 452 F.2d 315, 327–28 (8th Cir. 1971). Since I find their reasoning far more persuasive than the IBEW's analysis, I decline to hold that the Constitution is a bar, in the context of employment discrimination, to the application of race- or sex-conscious remedies based on numerical ratios.

█ Similarly, the intervenors' contention that the seniority override is so unjustifiably discriminatory that it violates due process, see *Bolling v. Sharpe, supra,* must also fail. Given the evidence of the defendants' past discrimination that the government plaintiffs were prepared to introduce, see Doc. # 86, Appendices II–V, given the factors that were considered in the develop-

ment of the goals and timetables that are embodied in the Consent Decree, see Affidavit of David A. Copus, Appendix I to Doc. # 86, ¶¶ 7–10, and Affidavit of Lee A. Satterfield, Exhibit I to Doc. # 79, ¶ 9, given the provisions for periodic review, and possible adjustment or elimination, of the decree's targets and goals in light of the experience of the government plaintiffs and the defendants with the decree, see Consent Decree, Part A, Section II and Memorandum of Agreement, Part A, § II, 1 CCH Emp.Prac. ¶ 1860, at 1533–4, given the exemption from correcting outstanding deficiencies that is extended to the defendants if, despite their good faith recruiting efforts, they are unable to fill vacancies with members of protected groups, see Doc. # 73, Proposed Supplemental Order, Part I, § B, 4, and given the limitation of the use of the override to the six-year life of the decree, see Consent Decree, Part B, § IV, the use of the seniority override to remedy that prior discrimination and to achieve those carefully fashioned and temporally limited goals and timetables can scarcely be called arbitrary or capricious or violative of due process.

Finally, any lingering doubts in this circuit about the constitutionality of the goal and quota remedies established by the Consent Decree and the Proposed Supplemental Order have been dispelled by the recent decision in *United States v. International Union of Elevator Constructors, Local Union No. 5,* 538 F.2d 1012 (3d Cir., filed July 21, 1976). There, the court of appeals held that due process and equal protection objections to remedial goals and quotas were "foreclosed by the settled law of this circuit." 538 F.2d at 1018, relying on *Erie Human Relations Commission v. Tullio, supra,* and cases cited therein. The Constitution does not bar either the affirmative action override or the goals and timetables it is designed to achieve.

---

**22.** Two Third Circuit cases appear in the *Rios* catalogue: *Commonwealth of Pennsylvania v. O'Neill,* 473 F.2d 1029 (3d Cir. 1973) (en banc), and *Contractors Association of Eastern Pennsylvania v. Secretary of Labor,* 442 F.2d 159 (3d Cir.), cert. denied, 404 U.S. 854, 92 S.Ct. 98, 30 L.Ed.2d 95 (1971). See also *Erie Human Relations Commission v. Tullio,* 493 F.2d 371, 375 n. 7 (3d Cir. 1974).

3. *Does the Affirmative Action Override Violate § 703(a) of the Civil Rights Act of 1964?*

 The intervenors argue that use of the affirmative action override is prohibited by § 703(a).[23] That contention must be rejected. In the first place, one of the leading employment discrimination cases in this Circuit, *Contractors Association of Eastern Pennsylvania v. Secretary of Labor*, 442 F.2d 159 (3d Cir. 1971), is directly on point. In *Eastern Contractors*, plaintiffs had challenged the "Philadelphia Plan," an affirmative action program for employment in the construction industry promulgated pursuant to Executive Order No. 11246, the same executive order under which the United States sues as plaintiff in the instant action. In response to plaintiffs' assertion that the Philadelphia Plan would compel employees to refuse to hire some white workers for racial reasons, classify other employees on the basis of race, and thus violate § 703(a), the court in *Eastern Contractors* first reviewed findings by the Department of Labor of past discrimination in the construction industry, then said:

To read § 703(a) in the manner suggested by the plaintiffs we would have to attribute to Congress the intention to freeze the status quo and to foreclose remedial action under other authority designed to overcome existing evils. We discern no such intention either from the language of the statute or from its legislative history. Clearly the Philadelphia Plan is color-conscious. Indeed the only meaning which can be attributed to the "affirmative action" language which since March of 1961 has been included in successive Executive Orders is that Government contractors must be color-conscious. Since 1941 the Executive Or-

der program has recognized that discriminatory practices exclude available minority manpower from the labor pool. In other contexts color-consciousness has been deemed to be an appropriate remedial posture. *Porcelli v. Titus*, 302 F.Supp. 726 (D.N.J.1969), aff'd, 431 F.2d 1254 (3d Cir. 1970); *Norwalk CORE v. Norwalk Redevelopment Agency*, 395 F.2d 920, 931 (2d Cir. 1968); *Offermann v. Nitkowski*, 378 F.2d 22, 24 (2d Cir. 1967). It has been said respecting Title VII that "Congress did not intend to freeze an entire generation of Negro employees into discriminatory patterns that existed before the Act." *Quarles v. Philip Morris, Inc., supra*, 279 F.Supp. 505 at 514. The *Quarles* case rejected the contention that existing, nondiscriminatory seniority arrangements were so sanctified by Title VII that the effects of past discrimination in job assignments could not be overcome.[47]

[47] The federal courts in overcoming the effects of past discrimination are expressly authorized in Title VII to take affirmative action. 42 U.S.C. § 2000e–5(g). See *Vogler v. McCarty*, 294 F.Supp. 368 (E.D.La.1968), aff'd sub. nom. *International Ass'n Heat & Frost Insulation and Asbestos Workers v. Vogler*, 407 F.2d 1047 (5th Cir. 1969).

We reject the contention that Title VII prevents the President acting through the Executive Order program from attempting to remedy the absence from the Philadelphia construction labor of minority tradesmen in key trades.

442 F.2d at 173. See *Southern Illinois Builders Association v. Ogilvie*, 471 F.2d 680, 684–86 (7th Cir. 1972). Similarly, in the instant case, while the affirmative action override is both color-conscious and sex-conscious, it is necessarily so in order to comply with the " 'affirmative action' lan-

**23.** Section 703(a) of Title VII, 42 U.S.C. § 2000e–2(a), provides as follows:

(a) It shall be an unlawful employment practice for an employer—

(1) to fail or refuse to hire or to discharge any individual, or otherwise to discriminate against any individual with respect to his compensation, terms, conditions, or privileges of employment, because of such individu-

al's race, color, religion, sex, or national origin; or

(2) to limit, segregate, or classify his employees or applicants for employment in any way which would deprive or tend to deprive any individual of employment opportunities or otherwise adversely affect his status as an employee, because of such individual's race, color, religion, sex, or national origin.

guage" of the executive order. The plaintiffs cannot prevail on their argument that § 703(a) precludes use of the affirmative action override, as contained in the Consent Decree and the Proposed Supplemental Order, to achieve the goals of the Executive Order program.

█ Focusing on the use of the word "individual" in § 703(a), the intervenors also contend that the override is unlawful under the section because it confers a benefit on persons who, though members of a group that has been subjected to discrimination, have not themselves been victims of discrimination.[24] A similar argument was made to the court of appeals for the Eighth Circuit, sitting *en banc* in *Carter v. Gallagher*, 452 F.2d 315 (8th Cir. 1971). Reversing a panel decision that had rejected a class-oriented remedy, the court held that "the presence of identified persons who have been discriminated against is not a necessary prerequisite to ordering affirmative relief in order to eliminate the present effects of past discrimination." 452 F.2d at 330. See *United States v. Bethlehem Steel Corporation*, 446 F.2d 652, 660 (2d Cir. 1971) ("The discrimination found illegal here was to a group; group remedy is therefore appropriate"); *United States v. Ironworkers Local 86*, 443 F.2d 544, 553 (9th Cir.), *cert. denied*, 404 U.S. 984, 92 S.Ct. 447, 30 L.Ed.2d 367 (1971); *United States v. Sheet Metal Workers Local 36*, 416 F.2d 123, 132 (8th Cir. 1969); *Local 53, International Association of Asbestos Workers v. Vogler*, 407 F.2d 1407 (5th Cir. 1969). Class-oriented relief under Title VII is, therefore, by no means a judicial anomaly. See, *e. g.*, *Pettway v. American Cast Iron Pipe Company*, 494 F.2d 211, 256–63 (5th Cir. 1974); *Johnson v. Goodyear Tire & Rubber Co.*, 491 F.2d 1364, 1874–75 (5th Cir. 1974).

Furthermore, during its consideration of the Equal Employment Opportunity Act of 1972, Congress specifically rejected the view, advanced by the intervenors here,

particularly the IBEW, that employment discrimination is only a matter of discrete, individual wrongs. In the judgment of Congress, it was a problem involving "systems" and "effects," and was therefore "a far more complex and pervasive phenomenon." Sen.Rept. No. 92–415, Comm. on Labor and Public Welfare, 92d Cong., 1st Sess. (1971) at 5, reprinted in *Legislative History of the Equal Employment Opportunity Act of 1972*, Sub-Comm. on Labor, Comm. on Public Welfare, U.S. Senate, 92d Cong., 2d Sess. (1972) at 414.

The rationale that supports the granting of a limited remedial preference to individuals who may not themselves have been victims of discrimination was lucidly explained in *Patterson v. Newspaper & Mail Deliverers Union of New York and Vicinity*, 514 F.2d 767 (2d Cir. 1975). Rejecting an intervenor's objection to a settlement that involved accelerated promotions for minorities, the court pointed out that, absent industry-wide discrimination, more minority persons would have obtained on their own the seniority bestowed on them by the settlement, and that the intervenor himself may well have been a modest beneficiary of industry-wide discrimination remedied by the settlement. 514 F.2d at 775. The parallels between *Patterson* and the instant case are striking. Absent the system-wide discrimination complained of here, more women and minorities would have achieved on their own the jobs to which the seniority override now gives them access, and many of the employees represented by the instant intervenors may well have been at least modest beneficiaries of the discrimination the Consent Decree and the Proposed Supplemental Order seek to remedy.

For all of these reasons I conclude that § 703(a) does not bar the remedial goals and timetables established by the Consent Decree and the PSO, nor does it prohibit the use of the seniority override to achieve them.

---

24. In this regard, the intervenors' stance is less than completely consistent. The IBEW, for example, concedes that Title VII proscribes acts based upon class factors, Doc. # 80, at 15 n. 12, yet vigorously objects to a class-oriented remedy.

### 4. Does the Affirmative Action Override Violate § 703(h) of the Civil Rights Act of 1964?

The intervenors vigorously argue that the seniority override, because in some instances it modifies a bona fide seniority system, violates § 703(h) of the Act, 42 U.S.C. § 2000e–2(h), which states in pertinent part that it shall not be an unlawful employment practice for an employer to apply to employees different conditions of employment pursuant to a bona fide seniority or merit system.[25] To support their contentions, the intervenors relied almost exclusively on *Jersey Central Power & Light Co. v. International Brotherhood Electrical Workers*, 508 F.2d 687 (3d Cir. 1975). After a careful review of that decision and of other relevant precedents in the Third Circuit,[26] I had concluded that on several crucial issues *Jersey Central* was distinguishable from the instant case. There is, however, no need to discuss *Jersey Central Power & Light* in this opinion. Subsequent to oral argument in the instant case, the Supreme Court of the United States decided *Franks v. Bowman Transportation Company, Inc.*, 424 U.S. 747, 96 S.Ct. 1251, 47 L.Ed.2d 444 (1976), a case which authoritatively interpreted § 703(h) of the Civil Rights Act of 1964. Soon thereafter, the *Jersey Central* case, then on appeal, was vacated and re-manded to the court of appeals for the Third Circuit for further consideration in light of the *Franks* decision. 425 U.S. 987, 96 S.Ct. 2196, 48 L.Ed.2d 812 (1976). Obviously, then, *Franks* is dispositive of the intervenors' claim that the seniority override violates § 703(h).

In *Franks*, the district court had, *inter alia*, denied retroactive seniority relief to a class of black nonemployee applicants for over-the-road (OTR) driving positions with Bowman Transportation. The court of appeals for the Fifth Circuit, while it reversed the district court on other issues, affirmed the denial of seniority relief to the aforementioned class, holding that such relief was barred by § 703(h). The Supreme Court reversed.

Mr. Justice Brennan, writing for the court on the merits, first dismissed as "clearly erroneous" the conclusion of the court of appeals that discriminatory refusals to hire did not affect the good faith character of a seniority system. 424 U.S. at 757, 96 S.Ct. at 1261. He then proceeded to address the meaning of § 703(h):

"On its face, § 703(h) appears to be only a definitional provision; as with the other provisions of § 703, subsection (h) delineates which employment practices are illegal and thereby prohibited and which are not. Section 703(h) certainly does not

---

**25.** Section 703(h) of Title VII, 42 U.S.C. § 2000e–2(h) provides:

(h) Notwithstanding any other provision of this subchapter, it shall not be an unlawful employment practice for an employer to apply different standards of compensation, or different terms, conditions, or privileges of employment pursuant to a bona fide seniority or merit system, or a system which measures earnings by quantity or quality of production or to employees who work in different locations, provided that such differences are not the result of an intention to discriminate because of race, color, religion, sex, or national origin, nor shall it be an unlawful employment practice for an employer to give and to act upon the results of any professionally developed ability test provided that such test, its administration or action upon the results is not designed, intended or used to discriminate because of race, color, religion, sex or national origin.

**26.** Since hiring hall referrals are often made in accordance with seniority, see *Teamsters Local 357 v. NLRB*, 365 U.S. 667, 668, 81 S.Ct. 835, 836, 6 L.Ed.2d 11 (1961), it is clear that the court in *Eastern Contractors*, when it held that the Philadelphia Plan could lawfully interfere with valid hiring hall agreements, sanctioned, at least in principle, the use of an override of seniority in the construction industry to achieve the affirmative action goals of the Executive Order program. Obviously, then, there was no *per se* illegality about the use of a seniority override in another industry to achieve the same goals under the same program. Additionally, in *Wetzel v. Liberty Mutual Insurance Co.*, 508 F.2d 239, 247–48 and n. 4 (3d Cir.), *cert. denied*, 421 U.S. 1011, 95 S.Ct. 2415, 44 L.Ed.2d 679 (1975), though it stated no opinion about the relief proper in that case, the Third Circuit clearly accepted the proposition that "increased promotional opportunities for women" could be a permissible remedy in another case.

expressly purport to qualify or prescribe relief otherwise appropriate under the remedial provisions of Title VII, § 706(g), 42 U.S.C. § 2000e–5(g), in circumstances where an illegal discriminatory act or practice is found. Further, the legislative history of § 703(h) plainly negates its reading as limiting or qualifying the relief authorized under § 706(g)." Id. (footnote omitted).

After a comprehensive review of that legislative history, the court found "no indication in the legislative materials that § 703(h) was intended to modify or restrict relief otherwise appropriate once an illegal discriminatory practice occurring after the effective date of the Act is proved—as in the instant case, a discriminatory refusal to hire." Id. at 761, 96 S.Ct. at 1263. The court concluded that the Fifth Circuit had erred as a matter of law when it held that § 703(h) prohibited the granting of seniority relief.

█ In reliance on *Franks,* the Court of Appeals for the Third Circuit has recently held that § 703(h) does not limit the remedial power of a Title VII court. *United States v. International Union of Elevator Constructors, Local Union No. 5, supra,* 538 F.2d at 1019. It is therefore abundantly clear that § 703(h) does not bar seniority relief generally or the use of the seniority override in the instant case to achieve the goals and timetables established by the Consent Decree and the PSO.

5. *Does the Affirmative Action Override Violate § 703(j) of Title VII?*

█ The intervenors further argue that the seniority override is "preferential treatment" based on race, sex or national origin, and therefore violates § 703(j) of Title VII, 42 U.S.C. § 2000e–2(j).[27] I am not persuaded by their contentions. The purpose of § 703(j) was to preclude a finding of discrimination solely because a racial or sexual or ethnic imbalance existed in a particular work force. See *Rios v. Enterprise Association Steamfitters, Local 638,* 501 F.2d 622, 630 (2d Cir. 1974); *United States v. Wood, Wire and Metal Lathers International Union, Local Union No. 46,* 471 F.2d 408, 413 (2d Cir. 1973); and *United States v. International Brotherhood of Electrical Workers, Local No. 38,* 428 F.2d 144, 149 (6th Cir.), *cert. denied,* 400 U.S. 943, 91 S.Ct. 245, 27 L.Ed.2d 248 (1970). That section was not intended to prohibit affirmative relief for past discrimination, and has been held not to bar such relief by the courts of appeals in eight circuits. See *Associated General Contractors of Massachusetts, Inc. v. Altshuler,* 490 F.2d 9 (1st Cir. 1973), *cert. denied,* 416 U.S. 957, 94 S.Ct. 1971, 40 L.Ed.2d 307 (1974); *Rios v. Enterprise Association Steamfitters, Local 638, supra; Contractors Association of Eastern Pennsylvania v. Secretary of Labor,* 442 F.2d 159, 173 (3d Cir.), *cert. denied,* 404 U.S. 854, 92 S.Ct. 98, 30 L.Ed.2d 95 (1971); *Morrow v. Crisler,* 491 F.2d 1053, 1056 (5th Cir. 1974); *United States v. International Brotherhood of Electrical Workers, Local No. 38, supra; Southern Illinois Builders Association v. Ogilvie,* 471 F.2d 680, 685 (7th Cir. 1972); *United States v. N. L. Industries, Inc.,* 479 F.2d 354, 377 (8th Cir. 1973); and *United States v. Ironworkers Local 86,* 443 F.2d 544, 552–54 (9th Cir.), *cert. denied,* 404 U.S. 984, 92 S.Ct. 447, 30 L.Ed.2d 367 (1971).

27. Section 703(j) of Title VII, 42 U.S.C. § 2000e–2(j), provides as follows:

(j) Nothing contained in this subchapter shall be interpreted to require any employer, employment agency, labor organization, or joint labor-management committee subject to this subchapter to grant preferential treatment to any individual or to any group because of the race, color, religion, sex, or national origin of such individual or group on account of an imbalance which may exist with respect to the total number or percentage of persons of any race, color, religion, sex, or national origin employed by any employer, referred or classified for employment by any employment agency or labor organization, admitted to membership or classified by any labor organization, admitted to, or employed in, any apprenticeship or other training program, in comparison with the total number or percentage of persons of such race, color, religion, sex, or national origin in any community, State, section, or other area, or in the available work force in any community, State, section, or other area.

The court of appeals for the Sixth Circuit has succinctly stated the reason for this consistent interpretation of § 703(j):

"When the stated purposes of the Act and the broad affirmative relief authorization [sic] above are read in context with § 2000e–2(j), we believe that section cannot be construed as a ban on affirmative relief against continuation of effects of past discrimination resulting from present practices (neutral on their face) which have the practical effect of continuing past injustices.

"Any other interpretation would allow complete nullification of the stated purposes of the Civil Rights Act of 1964."

*United States v. International Brotherhood of Electrical Workers, Local No. 38, supra,* 428 F.2d at 149–50. Accord: *United States v. Local Union No. 212, IBEW,* 472 F.2d 634, 636 (6th Cir. 1973). See *United States v. Wood, Wire & Metal Lathers International Union, Local No. 46, supra,* 471 F.2d at 413 ("while quotas to obtain racial balance are forbidden, quotas to correct past discriminatory practices are not"); *Carter v. Gallagher,* 452 F.2d 315, 329 (8th Cir. 1971) ("even the anti-preference treatment section of the new Civil Rights Act of 1964 does not limit the power of a court to order affirmative relief to correct the effects of past unlawful practices").

In *Patterson v. Newspaper & Mail Deliverers' Union of New York and Vicinity,* 514 F.2d 767 (2d Cir. 1975), a case that, like the instant action, involved a settlement providing for promotional quotas, the court began its analysis of the promotion question by pointing out that "[i]t is well settled in this Circuit that [§ 703(j)] does not preclude the use of hiring quotas to remedy the effects of past discrimination." 514 F.2d at 772 n.3. It went on to uphold the promotional quota because "[a] reasonable preference in favor of minority persons in order to remedy past discriminatory injustices is permissible." Id. at 773.

In *Rios v. Enterprise Association Steamfitters, supra,* a case cited with approval in *Patterson,* the court of appeals for the Second Circuit explained in detail the relationship between § 703(j) and court-ordered affirmative action plans:

Where a racial imbalance is unrelated to discrimination, § 703(j) recognizes that no justification exists for ordering that preference be given to anyone on account of his race or for altering an existing hiring system or practice. But where the imbalance is directly caused by past discriminatory practices it is readily apparent that if the rights of minority members had not been violated, many more of them would enjoy those rights than presently do so and that the ratio of minority members enjoying such rights would be higher. No longer are we dealing with an "imbalance" attributable to non-discriminatory causes. The effects of such past violation of the minority's rights cannot be eliminated merely by prohibiting future discrimination, since this would be illusory and inadequate as a remedy. Affirmative action is essential. Since the nature and extent of such action depends on the facts of each case, it must of necessity be left to the sound discretion of the trial judge, who may in one case find that broad equitable relief will suffice to restore the balance but in another conclude that use of a more specific remedy is required.

501 F.2d at 631.

Finally, the court of appeals for this circuit has within recent weeks explicitly joined the other circuits that have held that quota remedies are permissible under Title VII, and are not prohibited by § 703(j). *United States v. International Union of Elevator Constructors, Local Union No. 5, supra,* 538 F.2d at 1019–1020.

The intervenors cannot cite a single case squarely supporting their argument that the override violates § 703(j). Instead, they attempt to distinguish *Contractors Association of Eastern Pennsylvania v. Secretary of Labor, supra,* and contend that the goals set out in the Proposed Supplemental Order conflict with the limited use of mathematical ratios approved in *Swann v. Charlotte-Mecklenburg Board of Education,* 402 U.S. 1, 91 S.Ct. 1267, 28 L.Ed.2d 554 (1971). For

reasons set forth elsewhere in this Opinion, I believe that the *Eastern Contractors* case does control many aspects of my decision here, and that *Swann* does not prohibit use of the goals and timetables established by the Consent Decree and the Proposed Supplemental Order.

In this connection, it is worth noting that the intervenors do not challenge the figures introduced by the defendants concerning Bell System affirmative action placements and overrides in 1973–1974. See, e. g., Doc. # 87, at 5 (CWA); Doc. # 90, at 15 (IBEW). Those figures appear in the affidavit of Donald E. Liebers, AT&T's Personnel Director for Employment and Equal Opportunity. Doc. # 82, Table I. They reveal that of 112,518 hires and promotions in the relevant job classifications, the affirmative action override was used 28,886 times, or in 25.6% of the placements, approximately one in four.[28] The government plaintiffs and the defendants rightly point out that this ratio is well within the acceptable range of affirmative action goals approved by courts in other cases, many of which have ordered affirmative action at ratios of one-to-one or one-to-two.

Throughout these proceedings, intervenors have maintained that the Bell System's affirmative action program, as implemented by the seniority override, constitutes illegal "reverse discrimination." While the Supreme Court has recently held that racial discrimination in favor of blacks and against whites is prohibited by Title VII, the court specifically declined to consider whether a remedial preference pursuant to an affirmative action program violates Title VII. *McDonald v. Santa Fe Trail Transportation Co.,* —— U.S. ——, 96 S.Ct. 2574, 2578 and n.8, 49 L.Ed.2d 493 (1976). As the foregoing analysis of cases decided under § 703(j) demonstrates, the weight of authority in the courts of appeals overwhelmingly

supports the proposition that such a preference is not a Title VII violation.

■ Accordingly, for all of the reasons set forth above, I hold that § 703(j) is not a bar to the remedial goals and timetables established by the Consent Decree and PSO in the instant case, and does not prohibit the use of the affirmative action override to achieve them.

### 6. Does the Affirmative Action Override Violate Executive Order No. 11246?

Insofar as the intervenors contend that the affirmative action override violates the Executive Order itself, that claim must be rejected, again on the authority of *Contractors Association of Eastern Pennsylvania v. Secretary of Labor, supra.* The plaintiffs there had contended that the affirmative action mandated in § 202 of the Order meant only the policing of actual present discrimination. The court noted that the Secretary of Labor, acting pursuant to § 201 of the Order, had interpreted "affirmative action" to require more than such policing. If the Secretary's action exceeded the scope of the Order, the court acknowledged, it was invalid and subject to judicial review. Relying on *Udall v. Tallman,* 380 U.S. 1, 85 S.Ct. 792, 13 L.Ed.2d 616, (1965), and *Bowles v. Seminole Rock & Sand Co.,* 325 U.S. 410, 65 S.Ct. 1215, 89 L.Ed. 1700 (1945), however, the court pointed out that "more than ordinary deference" is owed "to an administrative agency's interpretation of an Executive Order or regulation which it is charged to administer." 442 F.2d at 175. In light of the Attorney General's opinion that the Philadelphia Plan was valid[29] and of the President's acquiescence in the Secretary of Labor's interpretation of the Executive Order, the court held that the federal courts generally must defer to the Secretary's interpretation of the Order. Id. at 175.

---

**28.** The defendants contend that these figures actually overstate the number of seniority overrides, since the total number of overrides includes best qualifications overrides of incumbents and applicants as well. I need not consider this contention, since even if every use of the override involved a modification of contractual seniority standards, the ratio of overrides to total placements would still fall well within limits approved by the courts.

**29.** The court cited an opinion Letter of the Attorney General dated September 22, 1969.

The parallels between *Eastern Contractors* and the instant case are obvious. The Secretary of Labor has again interpreted "affirmative action" to mean more than mere policing against actual present discrimination, and that interpretation, as the court in *Eastern Contractors* said, is entitled to "more than ordinary deference" by the courts. 442 F.2d at 175. While I am not aware of an opinion letter of the Attorney General upholding the validity of the affirmative action override in the instant case, the Assistant Attorney General in charge of the Civil Rights Division of the Department of Justice has stated of record that use of the override is required by federal law. See Doc. # 75, Attachment I. Finally, the parties have not called to my attention any statement by the President that would indicate that he does not acquiesce in the Secretary of Labor's interpretation of the Executive Order in the instant case. In light of all these circumstances, then, and on the explicit authority of *Contractors Association of Eastern Pennsylvania, supra,* it is clearly proper for this court to defer to the Secretary of Labor's interpretation of the affirmative action clause here. I therefore hold that use of the affirmative action override in the instant case is consistent with Executive Order No. 11246.

This conclusion is further supported by the very language of the order in question. The intervenors suggest that Revised Order No. 4, 41 C.F.R. § 60–2.1 ff., issued pursuant to Executive Order No. 11246, does not embrace promotions. Yet that Order states in pertinent part that:

An acceptable affirmative action program *must* include an analysis of areas within which the contractor is deficient in the utilization of minority groups and women, and further, *goals and timetables* to which the contractor's good faith efforts *must* be directed to correct the deficiencies and, thus to achieve *prompt and full utilization* of minorities and women, at *all levels* and in *all segments* of his work force where deficiencies exist.

41 C.F.R. § 60–2.10 (emphasis added). In my judgment, this provision, requiring "prompt and full utilization" of protected groups "at all levels and in all segments" of a contractor's work force, would be meaningless unless the Order and the affirmative action program it contains embraced promotions. Moreover, the Order specifically requires the contractor to determine the availability of promotable and transferable minorities and women within the contractor's organization. 41 C.F.R. § 60–2.11(b)(1)(vi) and (2)(vi). Again, the inclusion of these subsections in the Order would be unintelligible unless promotions were within the scope of the Order and its affirmative action program. Moreover, the agency that issued Revised Order No. 4, the Labor Department's Office of Federal Contract Compliance, has concluded that the override is required if defendants are to maintain an "effective affirmative action program." See Consent Decree, Part A, § I. Clearly, Revised Order No. 4 does embrace promotions, and the seniority override does not violate Executive Order No. 11246.

7. *Does the Affirmative Action Override Violate the National Labor Relations Act?*

The intervenors further charge that use of the affirmative action override, insofar as it requires the modification of valid collective bargaining agreements, is a violation of the National Labor Relations Act, 29 U.S.C. § 151 *et seq.* Once again, the decision of the Third Circuit Court of Appeals in *Contractors Association of Eastern Pennsylvania v. Secretary of Labor, supra,* controls my resolution of this issue and, once again, the *Eastern Contractors* case demands that the arguments of the intervenors be rejected. In *Eastern Contractors,* certain building trades unions had alleged that implementation of the Philadelphia Plan would interfere with valid hiring hall agreements. The court held that nothing in the National Labor Relations Act purported to limit the contracting power of the federal government as exercised pursuant to Executive Order No. 11246. "If the Plan violates neither the Constitution nor federal

law, the fact that its contractual provisions may be at variance with other contractual undertakings of the contractor is legally irrelevant." 442 F.2d at 174. Noting that such a variance would be nevertheless quite relevant in the marketplace of labor-management relations, the court predicted that the economics of that marketplace would produce an accommodation between the contractual provisions desired by the unions and those desired by the government. "Such an accommodation," said the court, "will be no violation of the National Labor Relations Act." Id. at 174–75. The court then held that the absence of a judicial finding of past discrimination in the construction industry was without legal significance. The Department of Labor, it reasoned, had acted pursuant to an executive order, and a judicial determination of past discrimination was not a condition precedent to "the measures the President may require of the beneficiaries of federal assistance." Id. at 175. The specific affirmative action called for by the President's designees, the court concluded, did not violate the National Labor Relations Act. Id.

■■■ The same reasoning applies with equal force in the instant case. Once again, the federal government is acting pursuant to Executive Order No. 11246. Once again, the NLRA does not limit the contracting power of the federal government. Once again, the possible variance of contractual provisions required by the federal government with other contractual undertakings of the private contractor, in this case, the AT&T defendants, is "legally irrelevant." Once again, an accommodation of the conflicting contract provisions is likely, and such an accommodation is actually encouraged by the Memorandum of Agreement and the Consent Decree. Both expressly state that they do not restrict the right of the defendants and the intervenors to negotiate alternative provisions that also comply

with federal law, and both require the defendants to notify the intervenors of their willingness to bargain in good faith about such alternative provisions. Consent Decree, Part B, Section II, Paragraph D; Memorandum of Agreement, Section VII, 1 CCH Emp. Prac. ¶ 1860, at 1533–14. Here, too, a requirement of affirmative action by a government contractor need not be based on a judicial finding of past discrimination, and the specific affirmative action required does not violate the NLRA.

8. *Is the Affirmative Action Override a Permissible Remedy under § 706(g) of the Civil Rights Act of 1964?*

The foregoing analysis demonstrates that the affirmative action override, which is central to the achievement of the goals and timetables established by the Consent Decree and the PSO, violates neither the Consent Decree, nor the Constitution, nor applicable federal statutes, nor Executive Order No. 11246. I turn now to the question of whether, under the specific circumstances of this case, this court is authorized to order the override as a remedy for past employment discrimination.

The fundamental error that permeates the intervenors' arguments is their ahistoricity. This lack of perspective seemingly prevents the intervenors from distinguishing between practices that standing alone would be discriminatory and practices that, in the context of past class-based discrimination, grant a remedial preference to members of groups that suffered from such discrimination. When the intervenors ignore this distinction, they ignore defendants' prior employment policies. No matter what wrongs those policies may have caused, the intervenors appear to say, they are wrongs without remedies. I disagree. More important, so did Congress, when it enacted § 706(g) of the Civil Rights Act of 1964.[30]

---

**30.** Section 706(g) of Title VII, 42 U.S.C. § 2000e–5(g), provides in pertinent part:

(g) If the court finds that the respondent has intentionally engaged in or is intentionally engaging in an unlawful employment prac-

tice charged in the complaint, the court may enjoin the respondent from engaging in such unlawful employment practice, and order such affirmative action as may be appropriate, which may include, but is not limited to,

■ The courts have consistently recognized that the purpose of Title VII is not merely to identify unlawful employment practices, but to correct them. For example, the court of appeals for the Fifth Circuit has said that "Title VII is strong medicine and we refuse to vitiate its potency by glossing it with judicial limitations unwarranted by the strong remedial spirit of the act." *Johnson v. Goodyear Tire & Rubber Co.,* 491 F.2d 1364, 1377 (5th Cir. 1974) (footnote omitted). Moreover, the Supreme Court has held that "[w]here racial discrimination is concerned, 'the [district] court has not merely the power but the duty to render a decree which will so far as possible eliminate the discriminatory effects of the past as well as bar like discrimination in the future.'" *Albemarle Paper Company v. Moody,* 422 U.S. 405, 95 S.Ct. 2362, 2372, 45 L.Ed.2d 280 (1975) quoting *Louisiana v. United States,* 380 U.S. 145, 154, 85 S.Ct. 817, 13 L.Ed.2d 709 (1965).[31]

The leading case construing the broad remedial powers conferred on the courts by § 706(g) is *Franks v. Bowman Transportation Co., Inc., supra.* After holding that § 703(h) did not forbid an award of seniority relief, the Court turned to the question of whether such an award was a proper remedy under § 706(g). It first reviewed several considerations it had noted in earlier decisions [32] construing the intent of Congress in enacting Title VII—the Congressional desire to eliminate all invidiously discriminatory practices that create inequality of employment opportunity; the highest priority given to the elimination of such discriminatory practices; the "make-whole" purpose of Title VII; and the broad equitable discretion, including the ordering of affirmative action, vested in the federal courts to effectuate this purpose. *Franks, supra,* 424 U.S. at 763, 96 S.Ct. at 1263–64. Congress itself, said the Court, had endorsed the breadth of this discretion by empowering the courts, under § 706(g), "to fashion the most complete relief possible." Id. at 764, 96 S.Ct. at 1264, citing Section by Section Analysis of H.R. 1746, accompanying The Equal Employment Opportunity Act of 1972—Conference Report, 118 Cong. Rec. 7166, 7168 (1972). In the Court's view, seniority relief would ordinarily be necessary to effectuate the "make-whole" purposes of the Act. *Franks, supra,* at 766, 96 S.Ct. at 1265.[33]

■ Given the general availability of seniority relief under § 706(g), however, the question remains: is the use of the seniority override permissible in the instant case to achieve the goals and timetables established by the Consent Decree and the PSO? I am convinced that it is. In the first place, it is a limited, rather than unrestricted, grant of seniority relief. The affirmative action override has been variously described by the intervenors as a "separate seniority system" and as "preferential superseniority." See, e. g., Alliance Memorandum in Opposition to Proposed Supplemental Order, at 3–4. This is hardly the case. The override confers on its beneficiaries opportunities for promotion and transfer. Once those benefi-

---

reinstatement or hiring of employees, with or without back pay (payable by the employer, employment agency, or labor organization, as the case may be, responsible for the unlawful employment practice), or any other equitable relief as the court deems appropriate.

**31.** Since the Court was speaking in the context of the broad equitable powers conferred on the courts by Title VII, its remarks on the duty of district courts clearly apply to unlawful sex discrimination as well.

**32.** See, e. g., *Albemarle Paper Company v. Moody,* 422 U.S. 405, 95 S.Ct. 2362, 45 L.Ed.2d 280 (1975); *Alexander v. Gardner-Denver Co.,* 415 U.S. 36, 94 S.Ct. 1011, 39 L.Ed.2d 147

(1974); *McDonnell Douglas Corp. v. Green,* 411 U.S. 792, 93 S.Ct. 1817, 36 L.Ed.2d 668 (1973); and *Griggs v. Duke Power Company,* 401 U.S. 424, 91 S.Ct. 849, 28 L.Ed.2d 158 (1971).

**33.** In an extended footnote, 424 U.S. at 764, 96 S.Ct. at 1264 n. 21, the court rejected the contention that seniority relief is less available under the Act than other remedies. The legislative history of the 1972 amendments to the act cites with approval decisions of lower federal courts granting retroactive seniority relief, and expressly states that this body of case law will continue to control Title VII's construction and applicability. Section by Section Analysis of H.R. 1746, supra, at 7166.

ciaries are promoted or transferred, they are credited with seniority for all purposes only for time actually worked. Neither the Consent Decree nor the PSO provide for any further modification of current Bell System seniority standards. When they do mention these contractual standards in contexts other than transfer and promotion, they specifically leave those standards intact. See Consent Decree, Part A, § III, ¶¶ A and C. By no stretch of the imagination can the limited intrusion on existing seniority systems, for purposes of transfer and promotion only, be called either "a separate seniority system" or "superseniority."

■■ Moreover, I am fully satisfied that the goals and timetables the override is designed to achieve were arrived at by a process that was careful rather than casual, thorough rather than superficial, and reasonable rather than arbitrary. See my discussion of intervenors' objections to the constitutionality of the override, supra, p. 42. Accordingly, I decline to invalidate either the override or the goals and timetables which require its use. Those goals and timetables are clearly permissible under Title VII; the use of a limited and carefully fashioned remedy to achieve them in a timely manner is likewise permissible, and in no way exceeds the broad remedial power conferred on the federal courts by § 706(g).

■■ The seniority override is not a painless remedy, of course. I have no doubt that the implementation of the Consent Decree has occasioned considerable dissatisfaction among defendants' employees.[34] According to the CWA, the filling of vacancies through application of the affirmative action program has led to the filing of several thousand grievances. Fifty-seven of these have been approved for arbitration and are awaiting hearing or decision. The four ar-

bitrators' decisions already rendered have each adopted the union's position. Lawsuits have been filed in the Southern District of New York and the Northern District of Mississippi challenging defendants' refusal to submit to, or be bound by, arbitration. See Doc. # 65, CWA Memorandum of Points and Authorities, at 1.

■■ Relying on data of this kind, the intervenors have urged this Court to invalidate the override because it conflicts with contractual seniority standards and because it adversely affects employees who are bypassed for promotion. Neither argument is meritorious. The rights asserted by intervenors in behalf of their members "are not indefeasibly vested rights but mere expectations derived from a collective bargaining agreement and subject to modification." *United States v. Bethlehem Steel Corporation, supra,* 446 F.2d at 663. *Accord: Patterson v. Newspaper and Mail Delivers' Union of New York and Vicinity, supra,* 514 F.2d at 775. The Supreme Court has repeatedly held that "employee expectations arising from a seniority system agreement may be modified by statutes furthering a strong public policy interest," *Franks v. Bowman Transportation Co., Inc.,* 424 U.S. 778, 96 S.Ct. 1251, 1271, 47 L.Ed.2d 444 (1976) (footnote omitted) and cases cited therein, and has pointed out that "ameliorating the effects of past racial discrimination" is "a national policy objective of the 'highest priority.'" Id. The effect of the modification of collective bargaining agreements on the interests of some of intervenors' members is simply not a controlling consideration. "'If relief under Title VII can be denied merely because the majority group of employees, who have not suffered discrimination, will be unhappy about it, there will be little hope of correcting the wrongs to which the Act is directed.'" Id.

---

**34.** For example, the remedy may have adverse economic consequences for those employees of defendants who are passed over for promotion to a higher-paying job because defendants used the affirmative action override. Title VII recognizes a narrow but nevertheless real and complete immunity for employer conduct undertaken in good faith reliance on a written interpretation or opinion of the EEOC. 42 U.S.C. § 2000e–12(b); *Albemarle Paper Company v. Moody,* 422 U.S. 405, 95 S.Ct. 2362, 2374 n. 17, 45 L.Ed.2d 280 (1975). The Consent Decree and its accompanying documents in the instant case certainly constitute such an interpretation or opinion.

at 775, 96 S.Ct. at 1269, quoting *United States v. Bethlehem Steel Corporation,* 446 F.2d 652, 663 (2d Cir. 1971).

■■ Among the cases relied upon by the intervenors is *H. K. Porter Co. v. NLRB,* 397 U.S. 99, 90 S.Ct. 821, 25 L.Ed.2d 146 (1970), which held that the Labor Board could not order relief that was inconsistent with the purposes of the Act. Reliance on a federal labor law case is not in itself improper, for Title VII and the National Labor Relations Act are analogous statutes. See *Franks, supra,* 424 U.S. at 768; 96 S.Ct. at 1266. Still, the question remains whether the remedy challenged here is inconsistent with the purposes of Title VII. Mindful of the Congressional desire, expressed in the legislative history of the 1972 amendments, to empower the courts to fashion the most complete relief possible, *Franks, supra,* at 763, 96 S.Ct. at 1264, and having examined with care both the Consent Decree and the Proposed Supplemental Order, I have concluded that they do effectuate the purposes of Title VII. Ultimately, then, the *Porter* case is not helpful to the intervenors. I should also point out that § 706(g) of Title VII confers broader remedial powers on the courts than § 10(c) of the NLRA confers on the Labor Board. *Franks, supra,* at 769, 96 S.Ct. at 1266 n. 29.

I have reviewed other cases upon which intervenors rely, e. g., *United Papermakers and Paperworkers v. United States,* 5 Cir., 416 F.2d 980 (5th Cir. 1969), *cert. denied,* 397 U.S. 919, 90 S.Ct. 926, 25 L.Ed.2d 100 (1970), *United States v. Jacksonville Terminal Co.,* 451 F.2d 418 (5th Cir. 1971), *cert. denied,* 406 U.S. 906, 92 S.Ct. 1607, 31 L.Ed.2d 815 (1972). Clearly, after *Franks,* they no longer trace the outer limits of the seniority relief a court may award pursuant to § 706(g).

In sum, then, for all of the reasons set forth above and particularly mindful of the Congressional desire that the courts fashion "the most complete relief possible" for employment discrimination, I hold the seniority override is a permissible remedy under § 706(g) of the Civil Rights Act of 1964.

## C. Additional Objections to the Consent Decree and the Proposed Supplemental Order.

### 1. Matters for Collective Bargaining

#### a. Intervenors' Objections to the MUTP

The intervenors also challenge the use by the defendants, again in purported compliance with the Consent Decree, of certain procedural devices in the MUTP governing employee transfers and promotions. These include numerical limits on employee transfer applications, geographical limits on transfers, time-in-title requirements, and specific testing requirements. In the intervenors' view, these devices are not required by the Consent Decree, and their unilateral imposition by the defendants is a violation of the National Labor Relations Act. Two of the intervenors, however, specifically admit that the controverted provisions of the MUTP are bargainable items. Doc. # 90, at 26, 31 (IBEW); Doc. # 87, at 8 (CWA). The Alliance has not expressly conceded this point, but since it has adopted the IBEW's arguments, it is safe to assume that it too considers those provisions bargainable.

■■■ The Consent Decree seeks to accommodate the mandates of the Civil Rights Act of 1964 with the national labor policy favoring collective bargaining. Accordingly, it permits and even encourages AT&T and the union intervenors to negotiate alternatives to its terms that also comply with federal law. See Consent Decree, Part B, § II, ¶ D. The role of a court in reviewing a settlement like the one challenged here is to seek to effectuate the purposes of *both* Title VII *and* the NLRA. While it must grant the relief demanded by the provisions of the Civil Rights Act, it must avoid unwarranted interference with the collective bargaining process whose encouragement has been an important national priority for almost forty years. In the concrete, this means that a court should leave employers and unions free to bargain about whatever is bargainable. Accordingly, I decline the intervenors' invitation to modify the provisions of the MUTP in ques-

tion. They are proper subjects for collective bargaining, and any modification of them should flow, not from an edict of this Court, but from the collective bargaining process itself.

Though I decline to grant the intervenors the relief they request with respect to the admittedly bargainable provisions of the MUTP, I remind the defendants that Part B, § II, ¶ D of the Consent Decree obliges them to bargain in good faith with the intervenors over acceptable alternatives to the provisions of the Decree. Since this court retains jurisdiction over the decree, I would expect the intervenors, who, while not parties to the decree, are parties to this litigation, to notify the Court promptly if defendants fail to comply with Part B, § II, ¶ D of the decree.

b. "Best Qualifications" Standard for Promotion

■■■ Though it does not allege a violation of the Labor Act, the CWA has contended, not without justification, that the prior "best qualified" promotion standard resulted in a departmental promotion plan, because in most cases an employee could acquire the requisite qualifications for promotion only in the same department where the promotional opportunity existed. It therefore asks the Court to abolish the "best qualified" criterion for promotion, and to replace it with a standard involving only basic qualifications and net credited service. Doc. ¶ 77, at 7. There is, of course, considerably irony in CWA's request: while it urges the modification of a merit system, it has consistently argued that a seniority system is inviolate, yet both are declared not to be unlawful employment practices by § 703(h). In any event, I do not intend to intrude the Court any further into the structure of labor-management relations than is required to effectuate the policies of Title VII. Accordingly, I decline CWA's invitation to abolish the "best qualified" standard for promotion es-

tablished by its collective bargaining agreements with defendants.[35] The defendants argue that the intervenors, insofar as they invite this Court to address itself to matters that are proper subjects of collective bargaining, have exceeded the scope of the intervention permitted by the court of appeals for the Third Circuit. While I have rejected intervenors' invitation, I do not rely on this particular contention of defendants. I have referred defendants and intervenors to the bargaining table, not because of any alleged violation of the scope of intervention, but rather because of the compelling national policy favoring resolution of labor-management disputes through the collective bargaining process.

2. The "Carry Forward" Procedure

■■■ The CWA additionally challenges the carry-forward provisions of the PSO as an improper remedy for alleged past discrimination. Interpreting those provisions as a modification of the defendants' existing seniority system, it relies primarily on the decision of the court of appeals for the Fifth Circuit in *Franks v. Bowman Transportation Company, Inc.,* 495 F.2d 398 (5th Cir. 1974), which held that a court could not award constructive seniority to victims of hiring discrimination. *Franks,* of course, has been reversed by the Supreme Court, 424 U.S. 747, 96 S.Ct. 1251, 47 L.Ed.2d 444, and with its reversal CWA's arguments must also fall. An award of seniority relief is not *per se* an impermissible remedy under Title VII. The propriety of an award depends on the circumstances of each individual case. *Franks, supra,* at 779, 96 S.Ct. at 1271–72.

The relief established by the "carry forward" procedure is, by the government's own admission, "ordinarily not sought." Doc. # 85, at 36. It is not, however, unprecedented. In *United States v. Central Motor Lines, Inc.,* 325 F.Supp. 478, 479 (W.D.U.C.), the court ordered the employer to hire six black over-the-road drivers

---

**35.** As a replacement for the "best qualified" promotion system, the CWA suggested an alternative promotion and transfer plan of its own. For the reasons set forth above, I decline to order its implementation as well.

"promptly," and to hire any additional over-the-road drivers in accordance with a one-for-one ratio of whites and blacks. And in *United States v. Dillon Supply Co.,* 3 EPD 7028, 7032 (E.D.N.C.1971), the court approved a consent decree which provided that the next six machine shop learners hired by the defendant be black and that 60 percent of all such persons hired thereafter be black. It would seem, then, that the granting of a preference of the kind embodied in the "carry forward" procedure lies within the broad discretion conferred on the courts by § 706(g) for the fashioning of appropriate relief. Having reviewed all of the circumstances present here, in particular, the purpose of the "carry forward" procedure—to correct past failures to comply in good faith with the Consent Decree—and the fact that the procedure does not expand the defendants' over-all obligations under the decree, I have concluded that the "carry forward" procedure is a proper remedy in this case.

It is true that some courts have stopped short of conferring an "absolute preference" on members of groups that have previously been discriminated against. See, e. g., *United States v. N. L. Industries, Inc.,* 479 F.2d 354, 377 (8th Cir. 1973); *Carter v. Gallagher,* 452 F.2d 315, 331 (8th Cir. 1971). In the context of the "carry forward" procedure under the Proposed Supplemental Order, however, intervenors' reliance on those cases is misplaced. While both *N. L. Industries* and *Carter* rejected an "absolute preference" as an *initial* remedy, they both approved the hiring of minorities according to reasonable ratios as such a remedy. 479 F.2d at 377; 452 F.2d at 330. In the instant case, the Consent Decree provided for a similar initial remedy, the achievement of reasonable goals according to reasonable timetables. The "carry forward" procedure is *not* an initial remedy. It is, rather, a remedy for a failure to comply in good faith with an initial court-ordered remedy.[36] I decline to speculate about what action the courts in *N. L. Industries* and *Carter* would

have taken if the defendants in those cases had not complied with the remedy those courts approved. It is clear, however, that those cases did not involve the factual situation that exists in the instant case. Both are distinguishable.

Moreover, those who will benefit from the Proposed Supplemental Orders "carry forward" procedure for priority placements, the feature of the order that appears most objectionable to intervenors, will in fact receive *individual* relief, since they will be identified by name pursuant to provisions set forth in that order.

### 3. Designations and Determinations

■ The intervenors' objections to the use of geographical "establishments" and "affirmative action job classifications" are not well taken. Both principles flow from the requirements of the Executive Order that goals and timetables be related to specific labor markets, 41 C.F.R. § 60–2.11 and 2.12, and that jobs be identified according to functional similarities, inter-relationships and wage levels, 41 C.F.R. § 60–2.11(b).

■ The intervenors further object to the determinations of "underutilization," "goals," and "intermediate targets within stated time frames" in the Consent Decree, and to the methods used to make those determinations. The objections are without merit. Revised Order No. 4 requires that such determinations be made. 41 C.F.R. § 60–2.11(b) and 2.12. The determinations made in the instant case were based on a thorough investigation of defendants' employment practices, were the product of extensive discussions among the government plaintiffs and of protracted negotiations between the government plaintiffs and the defendants, and were established only after consideration of the kinds of factors required by Revised Order No. 4 to be analyzed in the development of any affirmative action program. Affidavit of David A. Copus, Doc. # 86, Appendix I, ¶¶ 2–5, ¶¶ 6–7, ¶¶ 8–9; 41 C.F.R. § 60–2.11(b). They are

---

**36.** The defendants' non-admission of non-compliance with the Consent Decree is, like their

denial of liability in the Consent Decree itself, legally irrelevant in this context.

deficient in neither substance nor procedure.

### 4. Factual Foundation

 Though the intervenors complain that the findings by the government plaintiffs of the defendants' non-compliance with the Consent Decree and the government's assessment of deficiencies under the Proposed Supplemental Order lack an adequate factual foundation, I read the record differently. It reveals that the GCC conducted a careful inquiry, employing a variety of investigative techniques, to determine the extent of the defendants' compliance with the decree. See Doc. # 86, Appendix I, Affidavit of David A. Copus, ¶¶ 10–11. Because that inquiry was not the casual process alleged by intervenors, its results are not vulnerable to attack as being arbitrary or capricious. I do not find that the goals and timetables in either the decree or the supplemental order are, as intervenors contend, fatally flawed by imprecision. As the court said in *Rios, supra* at 631: "Nor are remedial goals limited to any specific or prescribed forum. The precise method of remedying past misconduct is left largely to the broad discretion of the trial judge." As I have remarked before, the instant case is unique—in its national scope, in the hundreds of thousands of employees affected and in the comprehensiveness of the relief afforded the beneficiaries of the settlement. Goals that are appropriate for members of a single police department or fire department or labor union local are not necessarily suited to the work force of one of the largest private employers in the nation, and the converse is also true.

 The court of appeals for the Fifth Circuit has noted in the context of the calculation of back pay awards that "unrealistic exactitude is not required." *Pettway v. American Cast Iron Pipe Company*, 494 F.2d 211, 260 (5th Cir. 1974). *A fortiori*, it would seem that when a court is dealing with the question of what is, in essence, proper injunctive relief for a significantly larger group of employees, similar "unrealistic exactitude" should not be required,

particularly where such a requirement would substantially frustrate the Congressional purpose expressed in Title VII.

### 5. Intervenors' Participation

 The intervenors, principally the IBEW, contend that the Consent Decree is invalid because the intervenors did not participate in the negotiations that preceded its entry. The argument is not novel. In the Steel Consent Decree case, certain of the intervenors had argued that the settlement should be voided because they had not been given prior notice of, or an opportunity to intervene in, the negotiations that led to the formulation of the decrees in question. The Court of Appeals for the Fifth Circuit dealt with that argument with dispatch:

> "[T]he court was clearly entitled . . . to deny vacation of the decrees absent a convincing showing that they operated to violate substantial rights of the intervenors. *See generally* 3B J. Moore's Federal Practice ¶¶ 24.16[1], 24.16[5] at 24–595–96, 24–651–52 (1974). They do not, and that decides the point."

*United States v. Allegheny-Ludlum Industries, Inc.*, 517 F.2d 826, 879 (5th Cir. 1975). In the instant case, as the preceding discussion has made clear, the Consent Decree does not violate any substantial rights of the intervenors. Accordingly, I decline to invalidate the decree because the intervenors did not participate in its formulation.

### 6. The Role of Arbitration

 The IBEW suggests that each use of the seniority override be reviewed by an arbitrator. This suggestion, if followed, would authorize arbitrators to adjudicate rights created by the remedial provisions of Title VII. Arbitrators, however, draw their authority from collective bargaining agreements, and the rights conferred by Title VII are in no way part of the collective bargaining process. *Alexander v. Gardner-Denver Company*, 415 U.S. 36, 51, 53, 94 S.Ct. 1011, 39 L.Ed.2d 147 (1974). The IBEW's suggestion is therefore clearly inappropriate. I decline to accept it.

### 7. Time Periods

██ The intervenors' claim that the Proposed Supplemental Order is open-ended is only superficially meritorious. While the order does extend the period of time during which the seniority override can be used, the extension applies only to groups whose goals were not met in 1973 because of the defendants' non-compliance with the decree and only to the extent that sufficient job openings do not occur during the remainder of the life of the decree to place the number of individuals who should have been placed in 1973.

### 8. Quarterly Placement Goals

██ Additionally, the IBEW has argued that provisions in the Proposed Supplemental Order requiring the defendants to use the override in order to meet quarterly placement goals, instead of the annual goals established in the original Consent Decree, violate Title VII and the executive order. I am not persuaded by this argument. If the goals themselves are permissible and, as the foregoing analysis demonstrates, I believe they are, the use of a mechanism to achieve those goals at a steady pace throughout a given time period is likewise permissible and is in no way a violation of either Title VII or Revised Order No. 4. *A fortiori,* the same reasoning applies to the annual goals established by the original Consent Decree.

### 9. Final Objections to the Proposed Supplemental Order

The intervenors, especially the IBEW, have raised a variety of other objections to the Proposed Supplemental Order. These objections involve an alleged absolute preference for members of protected groups during the period between the entry of the proposed order and the effective date of the "carry forward" procedure, the nature and timing of information to be supplied to the intervenors under the order, an exemption of the operating companies using posting and bidding systems from posting job vacancies when the companies can identify an individual entitled to priority placement, and the possibility that low level manage-ment employees of the defendants will carry out their responsibilities under the proposed order in an arbitrary fashion. Obviously, this last objection is both premature and speculative, and is certainly not a ground for rejecting the proposed order. I have carefully considered the other provisions of the proposed order that the intervenors object to, and I find that all of them are clearly permissible within the remedial context of this case. Moreover, the intervenors are again free to negotiate with the defendants alternative provisions that are also in compliance with federal law. Accordingly, these final objections of the intervenors to the proposed supplemental order are without merit. They provide no justification for a refusal by this Court to enter that order.

### V.

### CONCLUSION

As the foregoing opinion reveals, I have concluded on the unique facts of this case that none of the intervenors' objections to the Consent Decree and the Proposed Supplemental Order are meritorious, and that it is clearly permissible for defendants to use the affirmative action override to achieve the goals and timetables set forth in the decree and the proposed order. Accordingly, intervenors' petitions to modify the Consent Decree will be denied, the IBEW's motion for summary judgment will be denied, the CWA's motion for preliminary injunction will be dismissed as moot, and the joint motion of the Government plaintiffs and the defendants to enter the Proposed Supplemental Order will be granted.

An appropriate order will be entered.